# EXHIBIT A

# COMMONWEALTH OF VIRGINIA



ROCKINGHAM COUNTY CIRCUIT COURT
Civil Division
80 COURT SQUARE
HARRISONBURG VA 22802
(540) 564-3114

Summons

To: JAMES MADISON UNIVERSITY
800 S MAIN ST
HARRISONBURG VA 22807

Case No. 165CL22000410-00

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment, or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia on, Wednesday, February 23, 2022

Clerk of Court: CHAZ W. HAYWOOD

by _____
(CLERK/DEPUTY CLERK )

Instructions:

Hearing Official:

Attorney's name:    NORTH, BENJAMIN
717 KING ST
ALEXANDRIA VA 22314

# COVER SHEET FOR FILING CIVIL ACTIONS
COMMONWEALTH OF VIRGINIA

Case No. _CL22-410_
(CLERK'S OFFICE USE ONLY)

.......... ROCKINGHAM COUNTY .......... Circuit Court

DR. ERIC PAPPAS ......... v./In re: ......... JAMES MADISON UNIVERSITY, et al.
PLAINTIFF(S) ......... DEFENDANT(S)
See Attachment for List of Defendants

I, the undersigned [ ] plaintiff [ ] defendant [x] attorney for [x] plaintiff [ ] defendant hereby notify the Clerk of Court that I am filing the following civil action. (Please indicate by checking box that most closely identifies the claim being asserted or relief sought.)

## GENERAL CIVIL
**Subsequent Actions**
- [ ] Claim Impleading Third Party Defendant
  - [ ] Monetary Damages
  - [ ] No Monetary Damages
- [ ] Counterclaim
  - [ ] Monetary Damages
  - [ ] No Monetary Damages
- [ ] Cross Claim
- [ ] Interpleader
- [ ] Reinstatement (other than divorce or driving privileges)
- [ ] Removal of Case to Federal Court

**Business & Contract**
- [ ] Attachment
- [ ] Confessed Judgment
- [ ] Contract Action
- [ ] Contract Specific Performance
- [ ] Detinue
- [ ] Garnishment

**Property**
- [ ] Annexation
- [ ] Condemnation
- [ ] Ejectment
- [ ] Encumber/Sell Real Estate
- [ ] Enforce Vendor's Lien
- [ ] Escheatment
- [ ] Establish Boundaries
- [ ] Landlord/Tenant
  - [ ] Unlawful Detainer
- [ ] Mechanics Lien
- [ ] Partition
- [ ] Quiet Title
- [ ] Termination of Mineral Rights

**Tort**
- [ ] Asbestos Litigation
- [ ] Compromise Settlement
- [ ] Intentional Tort
- [ ] Medical Malpractice
- [ ] Motor Vehicle Tort
- [ ] Product Liability
- [ ] Wrongful Death
- [x] Other General Tort Liability

## ADMINISTRATIVE LAW
- [ ] Appeal/Judicial Review of Decision of (select one)
  - [ ] ABC Board
  - [ ] Board of Zoning
  - [ ] Compensation Board
  - [ ] DMV License Suspension
  - [ ] Employee Grievance Decision
  - [ ] Employment Commission
  - [ ] Local Government
  - [ ] Marine Resources Commission
  - [ ] School Board
  - [ ] Voter Registration
  - [ ] Other Administrative Appeal

## DOMESTIC/FAMILY
- [ ] Adoption
  - [ ] Adoption – Foreign
- [ ] Adult Protection
- [ ] Annulment
  - [ ] Annulment – Counterclaim/Responsive Pleading
- [ ] Child Abuse and Neglect – Unfounded Complaint
- [ ] Civil Contempt
- [ ] Divorce (select one)
  - [ ] Complaint – Contested*
  - [ ] Complaint – Uncontested*
  - [ ] Counterclaim/Responsive Pleading
  - [ ] Reinstatement – Custody/Visitation/Support/Equitable Distribution
- [ ] Separate Maintenance
  - [ ] Separate Maintenance Counterclaim

## WRITS
- [ ] Certiorari
- [ ] Habeas Corpus
- [ ] Mandamus
- [ ] Prohibition
- [ ] Quo Warranto

## PROBATE/WILLS AND TRUSTS
- [ ] Accounting
- [ ] Aid and Guidance
- [ ] Appointment (select one)
  - [ ] Guardian/Conservator
  - [ ] Standby Guardian/Conservator
  - [ ] Custodian/Successor Custodian (UTMA)
- [ ] Trust (select one)
  - [ ] Impress/Declare/Create
  - [ ] Reformation
- [ ] Will (select one)
  - [ ] Construe
  - [ ] Contested

## MISCELLANEOUS
- [ ] Amend Death Certificate
- [ ] Appointment (select one)
  - [ ] Church Trustee
  - [ ] Conservator of Peace
  - [ ] Marriage Celebrant
- [ ] Approval of Transfer of Structured Settlement
- [ ] Bond Forfeiture Appeal
- [ ] Declaratory Judgment
- [ ] Declare Death
- [ ] Driving Privileges (select one)
  - [ ] Reinstatement pursuant to § 46.2-427
  - [ ] Restoration – Habitual Offender or 3rd Offense
- [ ] Expungement
- [ ] Firearms Rights – Restoration
- [ ] Forfeiture of Property or Money
- [ ] Freedom of Information
- [ ] Injunction
- [ ] Interdiction
- [ ] Interrogatory
- [ ] Judgment Lien-Bill to Enforce
- [ ] Law Enforcement/Public Official Petition
- [ ] Name Change
- [ ] Referendum Elections
- [ ] Sever Order
- [ ] Taxes (select one)
  - [ ] Correct Erroneous State/Local
  - [ ] Delinquent
- [ ] Vehicle Confiscation
- [ ] Voting Rights – Restoration
- [ ] Other (please specify)

[x] Damages in the amount of $ 1,000,000.00 .......... are claimed.

2/23/2022
DATE

[ ] PLAINTIFF   [ ] DEFENDANT   [x] ATTORNEY FOR   [x] PLAINTIFF [ ] DEFENDANT

Benjamin North
PRINT NAME
Binnall Law Group, 717 King Street, Alexandria, VA 22314
ADDRESS/TELEPHONE NUMBER OF SIGNATOR
(703) 888-1943
ben@binnall.com
EMAIL ADDRESS OF SIGNATOR (OPTIONAL)

FORM CC-1416 (MASTER) PAGE ONE 07/16

> **\*"Contested" divorce** means any of the following matters are in dispute: grounds of divorce, spousal support and maintenance, child custody and/or visitation, child support, property distribution or debt allocation. An "Uncontested" divorce is filed on no fault grounds and none of the above issues are in dispute.

FILED IN THE CLERK'S OFFICE ROCKINGHAM COUNTY, VA FEB 23 2022 DEPUTY CLERK

## Civil Action Type Codes
### (Clerk's Office Use Only)

Accounting ........................................................ ACCT
Adoption .......................................................... ADOP
Adoption – Foreign ............................................ FORA
Adult Protection ............................................... PROT
Aid and Guidance ............................................... AID
Amend Death Certificate ...................................... ADC
Annexation ...................................................... ANEX
Annulment ...................................................... ANUL
Annulment – Counterclaim/Responsive Pleading... ACRP
Appeal/Judicial Review
    ABC Board ................................................ ABC
    Board of Zoning ........................................ ZONE
    Compensation Board .................................. ACOM
    DMV License Suspension ................................. JR
    Employment Commission ................................ EMP
    Employment Grievance Decision ....................... GRV
    Local Government ..................................... GOVT
    Marine Resources ....................................... MAR
    School Board ............................................... JR
    Voter Registration .................................... AVOT
    Other Administrative Appeal .......................... AAPL
Appointment
    Conservator of Peace .................................... COP
    Church Trustee ........................................ AOCT
    Custodian/Successor Custodian (UTMA) ...... UTMA
    Guardian/Conservator ................................. APPT
    Marriage Celebrant ................................... ROMC
    Standby Guardian/Conservator ...................... STND
Approval of Transfer of Structured Settlement ............. SS
Asbestos Litigation ............................................... AL
Attachment ...................................................... ATT
Bond Forfeiture Appeal ....................................... BFA
Child Abuse and Neglect – Unfounded Complaint .. CAN
Civil Contempt ................................................ CCON
Claim Impleading Third Party Defendant –
  Monetary Damages/No Monetary Damages ........... CTP
Complaint – (Miscellaneous) ................................ COM
Compromise Settlement ................................... COMP
Condemnation ................................................ COND
Confessed Judgment ............................................. CJ
Contract Action .............................................. CNTR
Contract Specific Performance ............................ PERF
Counterclaim – Monetary Damages/No Monetary
  Damages ........................................................ CC
Cross Claim ................................................... CROS
Declaratory Judgment ...................................... DECL
Declare Death ................................................ DDTH
Detinue .......................................................... DET
Divorce
    Complaint – Contested/Uncontested ................ DIV
    Counterclaim/Responsive Pleading ............... DCRP
    Reinstatement – Custody/Visitation/Support/
      Equitable Distribution ............................. CVS
Driving Privileges
    Reinstatement pursuant to § 46.2-427 ............. DRIV
    Restoration – 3rd Offense ............................. REST
Ejectment ...................................................... EJET

Encumber/Sell Real Estate ..................................... RE
Enforce Vendor's Lien ....................................... VEND
Escheatment ..................................................... ESC
Establish Boundaries ........................................ ESTB
Expungement .................................................. XPUN
Forfeiture of Property or Money ......................... FORF
Freedom of Information ........................................ FOI
Garnishment .................................................. GARN
Injunction ......................................................... INJ
Intentional Tort .............................................. ITOR
Interdiction .................................................... INTD
Interpleader .................................................... INTP
Interrogatory .................................................. INTR
Judgment Lien – Bill to Enforce ......................... LIEN
Landlord/Tenant ................................................. LT
Law Enforcement/Public Official Petition ............. LEP
Mechanics Lien ............................................. MECH
Medical Malpractice ......................................... MED
Motor Vehicle Tort ............................................. MV
Name Change ..................................................... NC
Other General Tort Liability .............................. GTOR
Partition ........................................................ PART
Permit, Unconstitutional Grant/Denial by Locality LUC
Petition – (Miscellaneous) .................................. PET
Product Liability ............................................. PROD
Quiet Title ........................................................ QT
Referendum Elections ....................................... ELEC
Reinstatement (Other than divorce or driving
  privileges) .................................................. REIN
Removal of Case to Federal Court ........................ REM
Restore Firearms Rights – Felony ....................... RFRF
Restore Firearms Rights – Review ...................... RFRR
Separate Maintenance ........................................ SEP
Separate Maintenance – Counterclaim/Responsive
  Pleading ..................................................... SCRP
Sever Order .................................................... SEVR
Sex Change ...................................................... COS
Taxes
    Correct Erroneous State/Local ..................... CTAX
    Delinquent ............................................. DTAX
Termination of Mineral Rights ............................ MIN
Trust – Impress/Declare/Create .......................... TRST
Trust – Reformation ......................................... REFT
Uniform Foreign Country Money Judgments ...... RFCJ
Unlawful Detainer .............................................. UD
Vehicle Confiscation ......................................... VEH
Violation – Election Law ..................................... VEL
Voting Rights – Restoration .............................. VOTE
Will Construction ........................................... CNST
Will Contested ............................................... WILL
Writs
    Certiorari ................................................. WC
    Habeas Corpus ......................................... WHC
    Mandamus ............................................... WM
    Prohibition ............................................... WP
    Quo Warranto ........................................ WQW
Wrongful Death ................................................ WD

*Dr. Eric Pappas v. James Madison University, et al.*
New Civil Complaint

<u>List of Defendants</u>

1. JAMES MADISON UNIVERSITY;

2. AMY SIROCKY-MECK, *in her official and individual capacities;*

3. DAVID STRINGHAM, *in his individual capacity;* and

4. ELIZABETH PASS, *in her individual capacity.*

**VIRGINIA:**

## IN THE CIRCUIT COURT FOR ROCKINGHAM COUNTY

DR. ERIC PAPPAS,
   3106 Patterson Avenue
   Apartment #6
   Richmond, Virginia 23221,

      Plaintiff,

v.

JAMES MADISON UNIVERSITY,
   800 S. Main Street
   Harrisonburg, Virginia 22807;

AMY SIROCKY-MECK, *in her official
and individual capacities,*
   Madison Hall 4035
   100 E. Grace Street
   Harrisonburg, Virginia 22807;

DAVID STRINGHAM, *in his
individual capacity,*
   1318 Greystone Street
   Harrisonburg, Virginia 22802;

*and*

ELIZABETH PASS, *in her individual
capacity,*
   331 Franklin Street
   Harrisonburg, Virginia 22801,

      Defendants.

FILED IN THE CLERKS OFFICE
ROCKINGHAM COUNTY, VA

FEB 23 2022

DEPUTY CLERK

Case No. _CL22-410_

**JURY TRIAL DEMANDED**

## COMPLAINT

Dr. Eric Pappas was a distinguished professor at James Madison University

that was falsely and maliciously accused of sexual harassment by a female student.

Using a process violative of the Constitution and University Policy as well as riddled with bias based on sex, the University and its agents erroneously found Dr. Pappas "responsible" for this false accusation and constructively terminated him. Dr. Pappas' constructive termination wrongfully deprived him of at least a decade of employment at the University. Accordingly, Dr. Pappas brings this civil action against Defendants for violations of Title IX, the First Amendment, and the Due Process Clause of the Fourteenth Amendment to the United States Constitution, as well as breach of contract and tortious interference with contractual relations. For his Complaint against Defendants, Dr. Pappas states as follows:

**Parties**

1.      Dr. Eric Pappas was, at all times relevant to the allegations, an Integrated Science and Technology professor, teaching problem solving using innovative developmental psychology methodologies at James Madison University. He is domiciled at 3106 Patterson Avenue, Apartment #6, Richmond, Virginia 23221, Virginia.

2.      James Madison University (the "University") is a public state higher education institution located at 800 South Main Street, Harrisburg Virginia 22807, in Rockingham County, Virginia.

3.      Amy Sirocky-Meck was, at all times relevant to the allegations, the Title IX Coordinator at the University, responsible for the University's compliance with Title IX and the United States Constitution. In her official capacity, she is located at Madison Hall 4035, 100 E. Grace Street, Harrisonburg, Virginia 22807.

4.    David Stringham was, at all times relevant to the allegations, the Hearing Panel chair at the University. He was trained in the Policy of the University and knew that he was obligated to recuse himself if he could not adjudicate Title IX matters impartially. He is domiciled at 1318 Greystone Street, Harrisonburg, Virginia 22802.

5.    Elizabeth Pass was, at all times relevant to the allegations, a Hearing Panel member at the University. She was trained in the Policy of the University and knew that she was obligated to recuse herself if she could not adjudicate Title IX matters impartially. She is domiciled at 331 Franklin Street, Harrisonburg, Virginia 22801.

## Jurisdiction and Venue

6.    Subject matter jurisdiction is proper in the Commonwealth of Virginia and the Circuit Court of Rockingham County because the amount in controversy exceeds $25,000.

7.    This Court possesses personal jurisdiction over the University because it is a government agency of the Commonwealth. It possesses personal jurisdiction over the individual Defendants by virtue of their domicile and their transacting business in the Commonwealth. Va. Code § 8.01-328.1(A).

8.    Venue is proper in this Court because all causes of action arose in Rockingham County, Virginia. Va. Code § 8.01-262.

## University's Background

9.      Institutions of higher education are required by law, as interpreted by the United States Supreme Court, to adjudicate claims of sexual harassment under the auspices of Title IX. *See, e.g., Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998).

10.     Title IX is a federal statute prohibiting discrimination on the basis of sex for all persons in educational institutions that receive federal funding. *See* 20 U.S.C. § 1681.

11.     Should the University fail to adequately remedy sexual harassment on campus, it faces liability from alleged victims of sexual assault. These plaintiffs tend to be female.

12.     In April 2011, pressure on the University increased when the Obama Administration's Department of Education published a "Dear Colleague Letter." This guidance, despite not having undergone the formal rulemaking process, demanded that any university which receives federal funding, weaken procedural protections for accused students and faculty. This included limiting the right to a hearing for students and faculty accused of sexual harassment and lowering the burden of proof for these cases to preponderance of the evidence.

13.     The Dear Colleague Letter and later-issued guidance publicized statistics of a supposed "rape epidemic" on college campuses targeting female students. These statistics are demonstrably false and debunked.

4

14.     If the Department of Education saw the University as insufficiently protective of alleged female sexual harassment victims, the Department of Education could withdraw federal funding from the University.

15.     Thus, the Dear Colleague Letter and Department of Education incentivized universities receiving federal funding, including Defendant University, to find male accused students and faculty responsible for the alleged accusations regardless of the weight of the evidence against them.

16.     Defendant University receives federal funding. Withdrawal of federal funding by the Department of Education would be financially ruinous for the University.

17.     The University was previously sued by alleged female sexual harassment victims.

18.     The University spent significant resources defending those lawsuits.

19.     The University has also received significant public criticism of its handling of several sexual harassment cases brought by female students, including but not limited to three media reports detailing the University's alleged deliberate indifference to female students' reports. One such media report was published as recently as 2018.

20.     On or around June 27, 2014, the University received harsh criticism from *The Daily Show*'s Jon Stewart for its handling of three female students' Title IX complaints.

21.     Therefore, to avoid federal withdrawal of funding and significant negative media attention, the University and its employees had an incentive to limit any chance Dr. Pappas had at defending himself by removing procedural due process protections and to infect the investigation and adjudication with bias against him on the basis of sex. This, in turn, allowed the University to find Dr. Pappas, a male accused faculty member, responsible and expel him despite the meager evidence against him.

22.     **The Dear Colleague Letter was rescinded in 2017.**

23.     The University, however, retained all, or nearly all, of the staff positions the Dear Colleague Letter and its subsequent iterations required. These staff positions included a formal Title IX office and a Title IX Coordinator, both tasked with the enforcement of federal guidance on campus.

24.     All University personnel tasked with the administration of Title IX on campus, including all individual Defendants, are trained in the University's Policy. They are also trained in the general legal requirements of the process, including that Title IX matters must be conducted in a way that does not violate the Constitution.

### Background of Dr. Pappas and Jane Doe[1]

25.     Dr. Pappas has been a tireless feminist and social activist for several decades. He has always encouraged his students to confront difficult social issues in new and provocative ways.

---

[1] Jane Doe is a pseudonym for the accusing student's real name. Her identity is known to the parties and is preserved for confidentiality purposes.

26.     In 2013, after years of exceptional service to the academic community, he was promoted to the rank of full Professor, the highest rank a non-administrative University employee may occupy.

27.     When Dr. Pappas was promoted, University personnel heralded his unblemished professional record, his stellar student reviews, and his unique ability to amass a "small army" of highly engaged student assistants.

28.     To say he was highly respected by his colleagues and students would be an understatement.

29.     When Dr. Pappas was hired at the University, he signed an express contract with the University. This contract stated, among other provisions, that Dr. Pappas would only be terminated according to the "policies and procedures of JMU, including but not limited to … dismissal for misconduct."

30.     Dr. Pappas' contract with the University was renewed continuously for periods lasting up to and including the date of Dr. Pappas's constructive termination.

31.     During his lengthy employment at the University, Dr. Pappas was beloved by his students. He worked with over a hundred student employees, research assistants, teaching assistants, and student graders.

32.     These student employees are paid nominally ($250 per semester) and are essential for Dr. Pappas to effectively teach his courses and conduct his very active research and publishing work at National Science Foundation ("NSF").

33.     NSF requires that students be employed in grants associated with Dr. Pappas's work.

34.     At all relevant times, Jane Doe was a student at the University.

35.     From the Fall 2017 semester through the Fall 2018 semester, Jane Doe was a student of Dr. Pappas and was a student assistant and grader for two of Dr. Pappas's classes.

36.     In the Fall 2018 semester, Jane Doe occupied the role of lead student grader for Dr. Pappas.

37.     Jane Doe has an ideological interest in filing of Title IX complaints against male figures at the University.

### Jane Doe's Title IX Complaint

38.     On or around June 25, 2019, Jane Doe filed a Title IX complaint against Dr. Pappas, falsely alleging sexual harassment that allegedly occurred in the Spring 2018 semester.

39.     Jane Doe's only allegation with any specificity was her allegation that sexual harassment occurred during a conversation at an off-campus coffeeshop on May 11, 2018, where she contends that Dr. Pappas made sexual comments in the abstract.

40.     In her complaint, Jane Doe also falsely stated that Dr. Pappas had sexually harassed other students.

41.     Jane Doe also falsely alleged that Dr. Pappas engaged in a romantic relationship with one of his students, C.B.[2]

42.     Jane Doe fabricated these accounts.

---

[2] Witnesses are referred to herein by their initials, to preserve their identities while also providing the Court and the parties clarity.

43.     Dr. Pappas never sexually harassed Jane Doe nor anyone and has never engaged in any sexual or romantic relationship with any of his students.

44.     After filing her complaint, Jane Doe engaged in an aggressive campaign to recruit other accusers through text messages and social media.

45.     Jane Doe later published an op-ed detailing her false account of sexual harassment, in order to advocate for less due process protections on campus.

46.     Jane Doe continued to work closely with Dr. Pappas until at least December 2018, despite supposedly suffering sexual harassment seven months prior.

### The University Conducts Its Cursory Investigation

47.     Upon receiving Jane Doe's Title IX Complaint, Defendant Sirocky-Meck did not conduct an initial assessment or review, as required by University Policy 1340.

48.     Instead, Sirocky-Meck accepted Jane Doe's statements as true, and assumed that if proven, her allegations would violate the Policy. Without conducting any such assessment, Sirocky-Meck charged Dr. Pappas with hostile environment sexual harassment.

49.     At all relevant times, the University defined hostile environment sexual harassment as, in relevant part, conduct of a sexual nature that "is so severe, pervasive…, and objectively offensive… that it denies the ability of a person's ability [sic] to participate… in the institution's educational programs."

50.     University Policy afforded Dr. Pappas the right to be presumed "not responsible" throughout the investigation and adjudication.

51.     The University uses a Single Investigator Model to conduct its investigations, wherein the University assigns an investigator to bring the charges, investigate the matter, and make an initial determination as to the findings.

52.     Even if proven, Jane Doe's allegations that Dr. Pappas made abstract sexual comments would not constitute hostile environment sexual harassment because, among other things, such comments did not deny her the "ability to participate in the institution's educational programs."

53.     There was no evidence put forth by Jane Doe, or otherwise discovered in the investigation, that Jane Doe was deprived of her "ability to participate in the institution's educational programs."

54.     On the contrary, Jane Doe received stellar performance reviews from her students during the Fall 2018 semester – averaging ratings 4.7 out of 5 – demonstrating that she had not suffered any educational deprivation.

55.     Despite Jane Doe's obvious failure to state a Title IX violation, Sirocky-Meck approved Jane Doe's complaint and began a formal investigation.

56.     When Jane Doe's complaint was approved, University Policy required Sirocky-Meck to meet with Dr. Pappas and offer him interim supportive measures.

57.     Sirocky-Meck did not offer Dr. Pappas any such meeting to discuss supportive measures.

58.     Sirocky-Meck notified Dr. Pappas of Jane Doe's formal complaint on or around July 26, 2019. At the same time, Sirocky-Meck instituted mutual no contact

orders that prohibited Dr. Pappas and Jane Doe from having any contact directly or through third parties.

59.     University Policy requires that Title IX investigations be conducted in an impartial and unbiased manner and requires the exclusion of irrelevant evidence or evidence that is not "appropriate" to the investigation or the facts alleged.

60.     During the course of Sirocky-Meck's investigation of Jane Doe's false complaint, Sirocky-Meck did not speak with any non-party witnesses that had any personal knowledge of the allegations at the root of Jane Doe's complaint, the May 11, 2018 off-campus coffeeshop conversation.

61.     Instead, Sirocky-Meck accepted statements submitted by Jane Doe that purported to be from other students who suffered sexual harassment by Dr. Pappas.

62.     University Policy required that for a complaint to be submitted on another's behalf, that complaint must be designated a "third party complaint" and be subject to special timeliness requirements.

63.     Sirocky-Meck never designated the portions of Jane Doe's complaint that alleged sexual harassment on behalf of others a "third party complaint."

64.     Sirocky-Meck also failed to engage in any timeliness analysis of that complaint despite the fact that portions of Jane Doe's complaint alleged sexual harassment suffered by others multiple years prior to the date of Jane Doe's complaint.

65.     During the investigation, Jane Doe submitted to Sirocky-Meck several statements purporting to be from other students.

66.     Sirocky-Meck contacted some of these students and requested to interview them. Out of all the students contacted, only one student responded in support of Jane Doe, Jane Roe.[3]

67.     Jane Roe was a close friend of Jane Doe's and participated in Jane Doe's attempts to solicit Title IX complaints against Dr. Pappas from other students.

68.     Sirocky-Meck accepted these third-party accounts uncritically and added them to the investigation file.

69.     Sirocky-Meck also included Jane Roe's allegations, despite having no relevance to Jane Doe's allegations.

70.     By contrast, Dr. Pappas submitted over sixteen verified statements from his student graders who worked with him and Jane Doe. Each of these students testified that Dr. Pappas did not sexually harass Jane Doe or anyone else, to their knowledge.

71.     Sirocky-Meck deemed these accounts to be not relevant or otherwise excluded them.

72.     Dr. Pappas further submitted eighteen student grader support letters from the period of time in which Jane Doe was employed, which demonstrated that there were no issues of sexual harassment raised by anyone, including Jane Doe. Sirocky-Meck excluded these statements over concerns of student privacy, despite Dr. Pappas's offer to redact the names of the students involved.

---

[3] Jane Roe is a pseudonym for this student's real name. Her identity is known to the parties and is preserved for confidentiality purposes.

12

73.    By contrast, Sirocky-Meck never raised issues of student privacy with Jane Doe's submissions of other students' false sexual harassment allegations, and she included those students' names.

74.    One student, E.M., discovered that Jane Doe had fabricated an allegation of sexual harassment purportedly on her behalf.

75.    E.M. contacted Sirocky-Meck and stated that she had no allegation of sexual harassment against Dr. Pappas, and that Dr. Pappas had been nothing but professional with her. E.M. further stated that Jane Doe's complaint on her behalf was false.

76.    Despite E.M.'s account directly contradicting Jane Doe's, Sirocky-Meck credited Jane Doe's original report on E.M.'s behalf, instead of E.M.'s own statements that she had no complaint against Dr. Pappas.

77.    Another student, K.S., similarly discovered that Jane Doe had concocted allegations on K.S.'s behalf. K.S. submitted three statements to Sirocky-Meck explaining that Jane Doe's statement on her behalf was false. K.S. further stated that Jane Doe's statements alleging a romantic relationship between Dr. Pappas and C.B. were false.

78.    Nevertheless, Sirocky-Meck chose to credit Jane Doe's allegations on K.S.'s behalf rather than K.S.'s own statements.

79.    Having excluded or discredited Dr. Pappas's supporting evidence and accepting Jane Doe's evidence of dubious accuracy, Sirocky-Meck made an "initial

determination" that Dr. Pappas had committed sexual harassment and set the matter for a hearing.

80.    On or around September 16, 2019, Dr. Pappas inquired about the possibility of settling the case through mediation.

81.    The Policy provides for mediation between the parties.

82.    Sirocky-Meck responded to Dr. Pappas that the University would not facilitate any mediation, but that Dr. Pappas could settle privately with Jane Doe.

83.    When Sirocky-Meck made this statement, she knew that she had put in place no-contact orders which made this impossible. Thus, she knew that if Dr. Pappas were to reach out to try to privately settle with Jane Doe, he would subject himself to disciplinary action simply for communicating with Jane Doe.

84.    The hearing was set for October 23, 2019.

### The Sham Hearing

85.    Following Sirocky-Meck's initial determination, Dr. Pappas submitted a statement contesting Jane Doe's complaint and highlighting all of the contradictions in Jane Doe's statements.

86.    Per its Policy, the University convened a Hearing Panel.

87.    The hearing was held on October 23, 2019.

88.    The Hearing Panel chair, Defendant David Stringham, has a bias against men. He has endorsed a podcast titled "Scene on Radio MEN" which has as its description, in relevant part, "What's up with this male-dominated world? How

14

did we get sexism, patriarchy, misogyny in the first place? How can we get better at seeing it, and what can we do about it?"

89.    Another Hearing Panel member, Defendant Elizabeth Pass, sat on the University's Diversity Council and participated in meetings wherein the Council advocates for greater protection for female students and complains that the University's efforts to protect female students are not reflected in critical media reports.

90.    Elizabeth Pass has never argued for greater protection for male members of the University community.

91.    David Stringham and Elizabeth Pass formed the controlling majority of the Hearing Panel.

92.    The Hearing Panel advised that parties' attorneys and advisors were not to speak during the proceeding, except to advise their clients privately.

93.    Jane Doe did not attend the hearing.

94.    None of Jane Doe's witnesses attended the hearing.

95.    Dr. Pappas was therefore not permitted to ask any questions, to test the credibility or otherwise, of any witness or of Jane Doe.

96.    None of the parties' or witnesses' statements are made under oath at any point in the University process.

97.    Sirocky-Meck testified at the hearing to her initial determination that Dr. Pappas violated the Policy.

98.    Sirocky-Meck testified in the hearing that she did not speak to any of Jane Doe's witnesses to verify Jane Doe's complaint and did not speak to any witnesses that had firsthand knowledge of the May 11, 2018 off-campus coffeeshop meeting.

99.    The Hearing Panel reviewed statements from E.M. and K.S. which demonstrated that Jane Doe had lied about their "reports."

100.    Remarkably, the Hearing Panel found Jane Doe credible without hearing from her and found Dr. Pappas not credible despite hearing from him.

101.    The Hearing Panel found Dr. Pappas "responsible" for Jane Doe's allegations.

102.    The Hearing Panel rendered its decision on or around October 28, 2019, no later than five days after the hearing.

103.    Dr. Pappas submitted two appeals. One to the Dean and one to the Provost, respectively.

104.    Both the Dean and Provost summarily denied his appeal without substantive discussion of his arguments.

105.    The final appeal was denied on December 10, 2019, and the findings and sanctions were made final.[4]

---

[4] The Supreme Court of Virginia, in response to the COVID-19 Emergency, tolled all relevant statute of limitations in Virginia for 126 days. *See In Re: SEVENTH ORDER EXTENDING DECLARATION OF JUDICIAL EMERGENCY IN RESPONSE TO COVID-19 EMERGENCY* (Sup. Ct. Va. Jul. 8, 2020).

## The Impact on Dr. Pappas

106.   When Dr. Pappas was found "responsible" for sexual harassment, he was permanently barred from working with student assistants for the remainder of his employment at the University.

107.   This sanction made it impossible for Dr. Pappas to do his job because his high course load – many of these courses containing hundreds of students – required the active participation of student assistants.

108.   Without these student assistants, Dr. Pappas was unable to teach his classes and was unable to do his job because Dr. Pappas's research program required student researchers and assistants. Without such assistants, he was ineligible for key research grants.

109.   Thus, he was forced to resign.

110.   As a result of the University's wrongful finding, Dr. Pappas suffers severe emotional and psychological harm. Dr. Pappas has been attending psychotherapy for several months.

111.   Defendants have also caused Dr. Pappas severe financial harm.

112.   With this finding on Dr. Pappas's employment record, he is effectively barred from future employment in any other educational institution, or any professional consulting work that requires letters of recommendation from past employers.

113.   The University's wrongful result threatens Dr. Pappas's liberty to pursue his occupation of choice because he will not be hired anywhere that asks for

his employment record – which, at Dr. Pappas's doctorate level of employment – is everywhere.

114.   Dr. Pappas has been defamed on the University's Reddit message board website. Dr. Pappas's name is therefore easily searchable and associated with these false allegations and the University's erroneous finding.

115.   Jane Doe and Jane Roe continued to harass Dr. Pappas with their ever-growing list of false accusations.

116.   The female students started a petition to get Dr. Pappas banned from campus and to have him prevented from being in physical proximity to a female. The female students further wrote to Dr. Pappas's landlord in an effort to evict him. The University did nothing to prevent or remedy this harassment.

## CAUSES OF ACTION

### COUNT I:
### Violation of Title IX

### (Against James Madison University)

117.   Dr. Pappas incorporates by reference the above paragraphs.

118.   Dr. Pappas was a "person" at the University, entitling him to rights under Title IX. 20 U.S.C. §§ 1681 *et seq.*

119.   The University receives federal funding.

120.   The University discriminated against Dr. Pappas on the basis of sex by granting preferential treatment to his female accuser throughout the investigation and adjudication of her claim and manifesting prejudice against Dr. Pappas as a male throughout the same.

121.    The University was motivated by pressure from the Department of Education and by prior negative media reports to find male faculty members and male students responsible and discipline them.

122.    The University exhibited anti-male bias against Dr. Pappas by (1) immediately believing the female complainant's statements and not permitting Dr. Pappas to meaningfully challenge her testimony via an adversarial hearing; (2) discrediting or excluding all witnesses that did not corroborate the female complainant's version of events; (3) uniformly crediting the female complainant's statements, even when contradicted, and summarily disbelieving Dr. Pappas's statements, testimony, and supporting documents; (4) including irrelevant character evidence against Dr. Pappas and excluding relevant impeachment evidence against the female complainant; (5) appointing Hearing Panel members that were personally biased against men; and (6) finding Dr. Pappas responsible for sexual harassment even when the allegations would not constitute sexual harassment even if true. This is a non-exhaustive list of Defendants' anti-male bias shown in this case.

123.    The University's decision to discipline Dr. Pappas and issue sanctions against him was motivated and caused by its bias against him on the basis of his male sex.

124.    There is no legitimate, nondiscriminatory reason for the University's behavior.

125.    Even if a legitimate, nondiscriminatory reason exists, it is merely pretext for unlawful discrimination.

19

126.   Dr. Pappas has suffered severe professional, economic, and psychological harm as a result of this discriminatory process orchestrated against him. Therefore, Dr. Pappas requests compensatory damages, declaratory relief in the form of a declaration stating the University unlawfully discriminated against him on the basis of his sex, injunctive relief clearing his disciplinary record at the University, and any other relief the Court deems just and proper.

**COUNT II:**
**Violation of the Due Process Clause of the Fourteenth Amendment**
**to the United States Constitution**

**(Against individual Defendants sued in their individual capacities,**
**under 42 U.S.C. § 1983)**

127.   Dr. Pappas incorporates by reference the above paragraphs.

128.   The University is a state institution established by the Commonwealth of Virginia.

129.   The individual Defendants are "persons" operating under "the color of state law" because they were employees or agents of the state government, exercising state power, at all times relevant herein.

130.   The Fourteenth Amendment to the United States Constitution provides no state shall "deprive any person of life, liberty, or property, without due process of law."

131.   Fourteenth Amendment due process protections are required in higher education disciplinary proceedings.

132.   Dr. Pappas had a property interest in his continued employment at the University.

133.   **Dr. Pappas had a liberty interest in his reputation and status as an Integrated Science and Technology professor because (1) he had an interest in pursuing his occupation of choice and (2) Defendants extinguished his right to continued employment.**

134.   Defendants, by their unlawful actions, altered Dr. Pappas's legal status as professor in good standing by levying sanctions that forced him to resign.

135.   Defendants harmed Dr. Pappas's liberty interest in his reputation by **their erroneous determination that he committed sexual offenses, which prevents** him from continuing his employment elsewhere and will forever harm him when he applies to jobs that require background checks or character and fitness evaluations.

136.   Defendants Sirocky-Meck, Stringham, and Pass, acting on behalf of the University, deprived **Dr. Pappas of his due process rights, including: some form of** live hearing with some form of cross-examination; a meaningful appeal; and an impartial adjudication.

137.   Defendant Sirocky-Meck deprived Dr. Pappas of his due process rights **by using the Single Investigator Model to conduct her investigation, which among** other things (1) failed to afford Dr. Pappas a meaningful opportunity to be heard; (2) **failed to afford him the opportunity to confront his accuser; (3) failed to allow him to** conduct any investigation whatsoever or any mediation; and (4) failed to allow him the ability to meaningfully present witnesses or evidence in his defense.

138.   The Hearing Panel Defendants compounded these deprivations of due process when they affirmed Defendant Sirocky-Meck's initial findings.

139.   Defendant Sirocky-Meck also oversaw these deprivations of due process and impliedly or expressly ratified them as the official responsible for Title IX adjudications at the University.

140.   All individual Defendants sued in their individual capacity had the authority to rectify the due process deficiencies in this case. All chose not to do so.

141.   These individual Defendants, as agents of the University and the Commonwealth of Virginia, had no legitimate governmental interest that outweighed giving Dr. Pappas adequate procedural safeguards during the adjudication of the charges against him.

142.   This finding severely limits—if not destroys—Dr. Pappas's future professional career. Dr. Pappas will likely be unable to continue his employment with this finding on his record and will face severe and irreparable harm to his ability to seek employment, absent judicial intervention. Dr. Pappas has already suffered terminations from other employment opportunities after he disclosed the University's erroneous finding to those employers.

143.   Dr. Pappas requests compensatory damages including attorney's fees, punitive damages, and any other relief the Court deems just and proper, against all individual Defendants sued in their individual capacities.

## COUNT III:
### Violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution

### (Against Sirocky-Meck in her official capacity as Title IX Coordinator of the University, under 42 U.S.C. § 1983)

144.   Dr. Pappas incorporates by reference the above paragraphs.

145.   The University is a state institution established by the Commonwealth of Virginia.

146.   Sirocky-Meck is a "person" operating under "the color of state law" because she is an employee or agent of the state government, exercising state power, at all times relevant herein.

147.   The Fourteenth Amendment to the United States Constitution provides no state shall "deprive any person of life, liberty, or property, without due process of law."

148.   Fourteenth Amendment due process protections are required in higher education disciplinary proceedings.

149.   Dr. Pappas had a property interest in his continued employment at the University.

150.   Dr. Pappas had a liberty interest in his reputation and status as an Integrated Science and Technology professor because (1) he had an interest in pursuing his occupation of choice and (2) Defendants extinguished his right to continued employment.

151. Sirocky-Meck, by her unlawful actions, and the enforcement of the University's Policy altered Dr. Pappas's legal status as professor in good standing by levying sanctions that forced him to resign.

152. Sirocky-Meck harmed Dr. Pappas's liberty interest in his reputation by their erroneous determination that he committed sexual offenses, which will prevent him from continuing his employment elsewhere and will forever harm him when he applies to jobs that require background checks or character and fitness evaluations.

153. Sirocky-Meck, acting on behalf of the University, deprived Dr. Pappas of his due process rights to some form of live hearing with some form of cross-examination, denied him his due process right to a meaningful appeal, and denied him his due process right to an impartial adjudication.

154. Defendant Sirocky-Meck deprived Dr. Pappas of his due process rights by using the Single Investigator Model to conduct her investigation, which among other things (1) failed to afford Dr. Pappas a meaningful opportunity to be heard; (2) failed to afford him the opportunity to confront his accuser; (3) failed to allow him to conduct any investigation whatsoever or any mediation; and (4) failed to allow him the ability to meaningfully present witnesses or evidence in his defense.

155. The Hearing Panel Defendants compounded these deprivations of due process when they affirmed Defendant Sirocky-Meck's initial findings. Defendant Sirocky-Meck oversaw these deprivations of due process and impliedly or expressly ratified them as the official responsible for Title IX adjudications at the University.

156.   Sirocky-Meck had the authority to rectify the due process deficiencies in this case. All chose not to do so.

157.   Sirocky-Meck, as agent of the University and the Commonwealth of Virginia, had no legitimate governmental interest that outweighed giving Dr. Pappas adequate procedural safeguards during the adjudication of the charges against him.

158.   This finding severely limits—if not destroys—Dr. Pappas's future professional career. Dr. Pappas will likely be unable to continue his employment with this finding on his record and will face severe and irreparable harm to his ability to seek employment, absent judicial intervention. Dr. Pappas has already suffered terminations from other employment opportunities after he disclosed the University's erroneous finding to those employers.

159.   Dr. Pappas requests declaratory and injunctive relief against Sirocky-Meck in the form of (1) a permanent injunction prohibiting her or any agent of the University from making or maintaining any notation on Dr. Pappas's professional record relating to the investigation of the Jane Doe's complaint at the University and from taking any further action depriving him of his constitutional right to due process; and (2) declaratory relief in the form of a declaration that the adjudication at issue in this case violated Dr. Pappas's right to due process and a declaration that the Due Process Clause requires a live hearing with some form of live cross examination in this context.

## COUNT IV:
### Violation of the First Amendment to the United States Constitution

### (Against all individual defendants in their individual capacities, via 42 U.S.C. § 1983)

160.   Dr. Pappas incorporates by reference the above paragraphs.

161.   As an employee of the University and a citizen of the United States, Dr. Pappas has a right to free speech protected by the First Amendment to the United States Constitution, protecting him from government regulation of his speech, barring a few carefully proscribed exceptions.

162.   Individual Defendants, as agents for the University and the government, enforced University Policies in violation of the First Amendment under the "color of state law."

163.   Dr. Pappas's alleged comments about sex in the abstract and sexual norms, even if made, were protected speech. If made, Dr. Pappas made these comments as a citizen and not as an employee.

164.   No part of Dr. Pappas's alleged speech amounted to a true threat or any other exception to the broad protection of the First Amendment.

165.   Dr. Pappas was investigated, charged, and disciplined for allegedly exercising his right to free speech.

166.   Stringham and Pass punished Dr. Pappas for his free speech in violation of the First Amendment.

167.   Individual Defendants knew or should have known they were violating the First Amendment by enforcing these overbroad policies.

168.   Individual Defendants are trained to recognize and identify constitutionally protected speech when investigating complaints or imposing discipline.

169.   Dr. Pappas requests compensatory damages including attorneys' fees, punitive damages, and any other relief the Court deems just and proper, against all Individual Defendants in their individual capacities.

### COUNT V:
### Violation of the First Amendment to the United States Constitution

### (Against Sirocky-Meck in her official capacity as Title IX Coordinator of the University, via 42 U.S.C. §1983)

170.   Dr. Pappas incorporates by reference the above paragraphs.

171.   As an employee of the University and a citizen of the United States, Dr. Pappas has a right to free speech protected by the First Amendment to the United States Constitution, protecting him from government regulation of his speech, barring a few carefully proscribed exceptions.

172.   Sirocky-Meck, as agent for the University and the government, enforced University policies in violation of the First Amendment under the "color of state law."

173.   Dr. Pappas's alleged comments about sex in the abstract and sexual norms, even if made, were protected speech. If made, Dr. Pappas made these comments as a citizen and not as an employee.

174.   No part of Dr. Pappas's alleged speech amounted to a true threat or any other exception to the broad protection of the First Amendment.

175.   Dr. Pappas was investigated, charged, and disciplined for allegedly exercising his right to free speech.

176.   Defendant Sirocky-Meck knew or should have known she was violating the First Amendment by enforcing these overbroad policies. Defendant Sirocky-Meck is trained to recognize and identify constitutionally protected speech when investigating complaints or imposing discipline.

177.   Dr. Pappas requests declaratory and injunctive relief against Defendant Sirocky-Meck in her official capacity, in the form of (1) a permanent injunction prohibiting Defendant Sirocky-Meck from making any notation on Dr. Pappas's professional record relating to the discipline or investigation of speech protected by the First Amendment and (2) declaratory relief in the form of a declaration that the investigation and adjudication at issue in this case violated Dr. Pappas's right to free speech.

## COUNT VI
### Breach of Contract

### (Against the University)

178.   Dr. Pappas incorporates by reference the above paragraphs.

179.   In accepting the University's offer of employment, Dr. Pappas accepted the University's offer to enter into a contractual relationship wherein Dr. Pappas provide services in exchange for a salary.

180.   The parties agreed, expressly or impliedly, to abide by policies and procedures of the University.

181.   The University breached its contract with Dr. Pappas when it breached its own policies and procedures in its adjudication of the complaint against Dr. Pappas.

182.   Specifically, the University breached its contract when it (1) failed to conduct an initial assessment; (2) failed to afford Dr. Pappas a "prompt, adequate, reliable, and impartial" investigation of the complaint against him; (3) failed to gather and consider relevant and "appropriate" evidence; (4) constructed no contact orders in a way that prevented Dr. Pappas from availing himself of the mediation policy; and (5) failed to enforce the presumption of non-responsibility.

183.   As a result of the University's breach, Dr. Pappas has suffered substantial financial harm. Accordingly, Dr. Pappas requests compensatory and incidental damages.

## COUNT VII
### Tortious Interference with Contractual Relations

### (Against Defendant Sirocky-Meck in her individual capacity)

184.   Dr. Pappas incorporates by reference the above paragraphs.

185.   A valid contract existed between the University and Dr. Pappas.

186.   Defendant Sirocky-Meck knew that a contract existed between the University and Dr. Pappas.

187.   Defendant Sirocky-Meck intentionally interfered with this contractual relationship when she, as the agent entrusted with the University's obligation to

provide a "prompt, adequate, reliable, and impartial" investigation and to gather relevant and "appropriate" evidence, failed to do so.

188.    Sirocky-Meck intentionally interfered with this contractual relationship when she structured the no-contact orders in order to deprive Dr. Pappas of his right to attempt to secure a private settlement.

189.    Sirocky-Meck improperly admitted irrelevant character evidence against Dr. Pappas while excluding relevant impeachment evidence against Jane Doe.

190.    As a result of Sirocky-Meck's tortious interference, Dr. Pappas has suffered substantial financial, emotional, and psychological harm.

## JURY DEMAND

191.    Dr. Pappas demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE Dr. Pappas respectfully requests that this Court grant him the following relief against all Defendants:

1. Damages in the amount to be proved at trial, up to $1,000,000;

2. Punitive Damages in the amount of $350,000;

3. Costs of suit;

4. Attorneys' fees, pursuant to 42 U.S.C § 1988(b);

5. Injunctive relief in the form of expunging his disciplinary record; and

6. Such other and further relief as the Court deems necessary and proper.

Dated:  February 23, 2022

Eric Pappas
By Counsel

BINNALL LAW GROUP, PLLC

Benjamin North, VSB No. 97439
Lindsay R. McKasson, VSB No. 96074
717 King Street, Suite 200
Alexandria, Virginia 22314
Phone: (703) 888-1943
Fax: (703) 888-1930
ben@binnall.com
lindsay@binnall.com

*Counsel for Plaintiff Eric Pappas*