IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

DR. ERIC PAPPAS,

              Plaintiff,

v.

JAMES MADISON UNIVERSITY, et al.,

              Defendants.

Case No. 5:22-cv-00028-EKD

## DR. PAPPAS' SUPPLEMENTAL BRIEF

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................i

TABLE OF AUTHORITIES ....................................................................................... ii

ARGUMENT .............................................................................................................1

    I.  The Supreme Court's reasoning in *Kennedy v. Bremerton Sch. Dist.* supports Dr. Pappas' contention that he spoke as a citizen. ...............................................1

    II.  Recent decisions in Virginia federal courts support Dr. Pappas' interpretation of the Supreme Court of Virginia's Seventh Order. ............................................9

    III. Constructive termination is the legal equivalent of actual termination ..........12

CONCLUSION .........................................................................................................18

CERTIFICATE OF SERVICE ....................................................................................19

i

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. al-Kidd,*

   563 U.S. 731, 746 (2011) (Kennedy, J., concurring) ................................17

*Bd. of Educ. of Westside Cmty. Sch. v. Mergens By & Through Mergens,*

   496 U.S. 226, 250 (1990) ...........................................................................5

*Bd. of Regents of State Colleges v. Roth,*

   408 U.S. 564, 577 (1972) ..........................................................................14

*Ceriani v. Dionysus, Inc.,*

   No.: 4:21cv108, 2022 WL 1185896, at *4 (E.D. Va. April 20, 2022).............9, 10, 11

*Cleveland Bd. of Educ. v. Loudermill,*

   470 U.S. 532, 538-540 (1985) ...................................................................14

*Crockett v. SRA Int'l,*

   943 F. Supp. 2d 565, 576 (D. Md. 2013) ...................................................16

*Garcetti v. Ceballos,*

   547 U.S. 410, 424 (2006) ........................................................................3, 7

*Health Care Indus. Liab. Ins. Program v. Momence Meadows Nursing Ctr., Inc.,*

   566 F.3d 689, 697 (7th Cir. 2009) ............................................................16

*Hill v. Borough of Kutztown,*

   455 F.3d 225, 238 (3d Cir. 2006)..............................................................15

*Huskey v. City of San Jose,*

    204 F.3d 893, 900 (9th Cir. 2000) ..............................................................14

*\*Kennedy v. Bremerton Sch. Dist.,*

    142 S. Ct. 2407 (2022) ..............................................1, 2, 3, 4, 5, 6, 7, 8, 9

*Kennedy v. Bremerton Sch. Dist.,*

    443 F. Supp. 3d 1223 (W.D. Wash. 2020), *aff'd,* 991 F.3d 1004 (9th Cir. 2021), *cert.*

    *granted,* 142 S. Ct. 857, 211 L. Ed. 2d 533 (2022), and *rev'd,* 142 S. Ct. 2407 (2022)

    ..............................................................................................................2

*Knappenberger v. City of Phoenix,*

    566 F.3d 936, 941-942 (9th Cir. 2009) ........................................................15

*Lauck v. Campbell Cnty.,*

    627 F.3d 805, 813 (10th Cir. 2010) .............................................................14

*Lighton v. Univ. of Utah,*

    209 F.3d 1213, 1221-1224 (10th Cir. 2000) ................................................14

*Mahanoy Area Sch. Dist. v. B. L. by & through Levy,*

    141 S. Ct. 2038, 2044-2048 (2021) ..............................................................7

*Pennsylvania State Police v. Suders,*

    542 U.S. 129, 148 (2004) ...........................................................................16

*Ray v. Roane,*

    948 F.3d 222, 229 (4th Cir. 2020) ..............................................................17

*Reed v. Town of Gilbert, Ariz.,*

    576 U.S. 155, 171 (2015) .........................................................................4, 9

*Schultz v. U.S. Navy,*

    810 F.2d 1133, 1136 (Fed. Cir. 1987) ........................................................13

*Stone v. Univ. of Maryland Med. Sys. Corp.,*

    855 F.2d 167, 172-174 (4th Cir. 1988) ...............................................13, 17

*Thompson v. D.C.,*

    967 F.3d 804 (D.C. Cir. 2020) ...............................................................15

*Tinker v. Des Moines Independent Community School Dist.,*

    393 U.S. 503, 506 (1969) ...........................................................................2

*United States v. Stevens,*

    559 U.S. 460, 483-484 (2010) ..................................................................8

*Urofsky v. Gilmore,*

    216 F.3d 401, 406 (4th Cir. 2000) ..........................................................6

*Versarge v. Township of Clinton, New Jersey,*

    984 F.2d 1359, 1371 (3d Cir.1993) ........................................................15

*Winfree v. Hill,*

    No. 3:21-CV-00039, 2022 WL 2812057, at *4-5 (W.D. Va. July 18, 2022)........11, 12

On June 27, 2022, the Court heard oral argument from the parties regarding Defendants' motion to dismiss. During that hearing, the parties offered, and the Court requested, the filing of supplemental briefs. Accordingly, Dr. Pappas respectfully submits the following supplemental brief regarding: (1) *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2022); (2) the Supreme Court of Virginia's Seventh Order; and (3) constructive termination in the due process context. For the reasons stated below and those articulated during oral argument and written in Dr. Pappas' opposition, Defendants' motion to dismiss should be denied.

## ARGUMENT

### I.   The Supreme Court's reasoning in *Kennedy v. Bremerton Sch. Dist.* supports Dr. Pappas' contention that he spoke as a citizen.

On June 27, 2022, the Supreme Court decided *Kennedy v. Bremerton Sch. Dist.*, a case involving a high school football coach who was terminated by the public school district for praying on the football field at the conclusion of school football games, sometimes with students. *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2415-2419 (2022). Relevant to the instant case, the Court held that the school district violated the plaintiff's free speech rights by imposing discipline as a result of the on-field post-game prayer. *Kennedy*, 142 S. Ct., at 2424. It did so by clarifying the test used to resolve free speech claims in the context of public employment and reiterating the Court's past holding that neither teachers nor students "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Kennedy*, 142 S.

Ct., at 2423 (*citing Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 506 (1969)).

The Supreme Court articulated a clear two-step test to resolve free speech claims in this context.[1] First, courts should look to whether an employee speaks "pursuant to his or her official duties" or whether he or she "speaks as a citizen on a matter of public concern." *Id.* At this first step, the plaintiff bears the initial burden. *Kennedy*, 142 S. Ct., at 2424. Second, courts should look to whether the government's interests as an employer outweigh "even an employee's private speech on a matter of public concern." *Kennedy*, 142 S. Ct., at 2425. At this second step, the government bears the burden to show that its interests outweigh those of the employee. *Id.*

The Supreme Court applied this test to the facts in *Kennedy. Id.* In deciding the question of whether the plaintiff spoke as a citizen,[2] the Court looked to whether

_____

[1] In *Kennedy*, the district court had granted summary judgment to the government on the plaintiff's First Amendment claims. *See Kennedy v. Bremerton Sch. Dist.*, 443 F. Supp. 3d 1223 (W.D. Wash. 2020), *aff'd*, 991 F.3d 1004 (9th Cir. 2021), *cert. granted*, 142 S. Ct. 857, 211 L. Ed. 2d 533 (2022), and *rev'd*, 142 S. Ct. 2407 (2022). Therefore, this burden shifting framework appears to apply at summary judgment. The motion to dismiss stage, by contrast, merely tests the sufficiency of the Complaint, and cannot, by its nature, test whether the government has carried any burden before the Court. Therefore, it appears that a plaintiff may survive a motion to dismiss if he "carrie[s] his threshold burden" to show that he spoke as a citizen on a matter of public concern, before the burden shifts to the government at summary judgment to show that such an infringement was justified. *Kennedy*, 142 S. Ct., at 2425.

[2] The Court noted that the parties agreed that the plaintiff's speech "implicates a matter of public concern." *Kennedy*, S. Ct., at 2424. Therefore, the Court's analysis was limited to whether the plaintiff spoke as a citizen rather than an employee. *Id.*

his speech (saying prayers after school football games) was "ordinarily within the scope of his duties as a coach." *Kennedy*, 142 S. Ct., at 2424. The Court reasoned that, in saying his own prayers after football games, the plaintiff was not speaking pursuant to government policy, conveying a government message, "instructing players, discussing strategy, encouraging better on-field performance, or engaged in any other speech the District paid him to produce as a coach." *Id.* The Court concluded that, relevant to the substance of the speech, the plaintiff's speech did not "owe its existence" to the plaintiff's employment. *Id.* Finally, the Court noted that the "timing and circumstances" of the plaintiff's speech "confirmed" that he spoke as a citizen, in that the plaintiff prayed during times in which employees were free to "attend briefly to personal matters." *Kennedy*, 142 S. Ct., at 2425.

The Court also disposed of the Ninth Circuit's arguments to the contrary. *Id.* The Ninth Circuit had previously held that because the plaintiff remained "on duty" after games, and otherwise served as a role model for the students, he spoke as an employee when he prayed on the football field after football games. *Id.* The Supreme Court agreed with the Ninth Circuit that "teachers and coaches often serve as vital role models," but noted that the Ninth Circuit's argument committed it to positing an "'excessively broad job descriptio[n]' by treating everything teachers and coaches say in the workplace as government speech subject to government control." *Id.* (*citing Garcetti v. Ceballos*, 547 U.S. 410, 424 (2006)). The Court reasoned that by expanding the job description to "serving as role models," the government could be empowered to "fire a Muslim teacher for wearing a headscarf in the classroom or prohibit a

Christian aide from praying quietly over her lunch in the cafeteria." *Id.* Further, the Court again noted that the plaintiff prayed at a time in which other government employees were free to socialize or otherwise tend to personal matters and concluded that the timing and circumstances of the speech support the conclusion that the plaintiff spoke as a citizen. *Id.*

Turning to the second step of the analysis, the Court tested whether the government could meet its burden to show that the infringement of the plaintiff's free speech was justified.[3] The Court noted first that strict scrutiny typically applies to government restrictions of free speech,[4] "which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Id.*; *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 171 (2015). In *Kennedy*, the government contended that its actions were necessary to avoid an Establishment Clause violation, and therefore survived strict scrutiny. *Kennedy*, 142 S. Ct., at 2426. The government argued, among other things, that because a

---

[3] The Court applied the same analysis to the Free Exercise clause claim, but this brief is limited to the free speech claim and therefore will not address the specific freedom of religion arguments discussed by the Court.

[4] Justice Alito notes in a concurring opinion that the Court did not decide "what standard applies to such expression under the Free Speech Clause but holds only that retaliation for this expression cannot be justified based on any of the standards discussed." *Kennedy*, 142 S. Ct., at 2433-2434. Notably, however, no other Justices join Justice Alito's concurrence, and the majority did indicate that strict scrutiny "generally obtains" to the free speech claim. *See Kennedy*, 142 S. Ct., at 2426.

"reasonable observer" could conclude that plaintiff's speech was government speech and because the plaintiff's speech was "coercive," censorship was necessary. *Id.*

The Court emphatically disagreed with the government's proffered justifications. *Kennedy*, 142 S. Ct., at 2426. Perceptively, the Court noted that the government had placed itself in a "self-imposed trap" by construing the Establishment Clause to be opposed to the Free Exercise and Free Speech Clauses, when in actuality, the Clauses are complimentary. *Kennedy*, 142 S. Ct., at 2427. In other words, the government was not in danger of committing an Establishment Clause violation simply because of an observer's mistaken perception of the plaintiff's speech, and therefore the government was not forced to censor – in violation of the Free Speech Clause – for fear of violating the Establishment Clause. *Id.*

The Court further noted that "learning how to tolerate speech or prayer of all kinds is part of learning how to live in a pluralistic society, a trait of character essential to a tolerant citizenry." *Kennedy*, 142 S. Ct., at 2430 (internal citations omitted). Further, and as the Court has previously recognized, "'secondary school students are mature enough ... to understand that a school does not endorse,' let alone coerce them to participate in, 'speech that it merely permits on a nondiscriminatory basis.'" *Id.* (*citing Bd. of Educ. of Westside Cmty. Sch. v. Mergens By & Through Mergens*, 496 U.S. 226, 250 (1990)). Therefore, while it is possible that some offense could be taken at the speech, "offense does not equate to coercion." *Id.* (internal quotation omitted). Finally, there was no non-hearsay evidence in the record to support the government's contention that any student actually felt coerced. *Id.* For

5

these reasons and others, the government failed to carry its burden to show that the First Amendment infringement was justified.

Applying the Supreme Court's test and reasoning here, Dr. Pappas properly alleged a First Amendment violation. First, Dr. Pappas spoke as a citizen on a matter of public concern. At the pleading stage, taking his allegations as true, his speech concerning sociosexual norms was speech on a matter of public concern because it concerned "an issue of social, political, or other interest to a community." *Urofsky v. Gilmore*, 216 F.3d 401, 406 (4th Cir. 2000). As explained in Dr. Pappas' opposition, his speech concerned a matter of "social… interest," and was therefore speech on a matter of public concern. ECF No. 7, at 33 (*citing Urofsky*, 216 F.3d, at 406).

Further, and relevant to the Supreme Court's opinion in *Kennedy*, he spoke as a citizen. Like the plaintiff in *Kennedy*, Dr. Pappas did not speak in a manner typically within the scope of his duties; that is, the speech in question did not occur in the classroom, in a meeting required by the course, or even on campus. Dr. Pappas was not speaking pursuant to government policy, conveying a government message, "instructing [students], discussing [coursework], encouraging [in-class] performance, or engaged in any other speech [Defendants'] paid him to produce as a [professor]." *Kennedy*, 142 S. Ct., at 2424. Further, the "timing and circumstances" of Dr. Pappas speech "confirm[s]" that he spoke as a citizen, in that Dr. Pappas spoke during times in which employees were free to "attend… to personal matters." *Kennedy*, 142 S. Ct.,

at 2425. Dr. Pappas spoke as a citizen on a matter of public concern, and he has therefore carried his initial burden.[5]

Like the Ninth Circuit and government in *Kennedy*, Defendants may argue that Dr. Pappas' role at the University was to generally mentor students and meet with them even outside of class. But like in *Kennedy*, this argument would posit an "'excessively broad job descriptio[n]' by treating everything [Dr. Pappas] sa[id] in the workplace [and even off-campus] as government speech subject to government control." *Id.* (*citing Garcetti v. Ceballos*, 547 U.S. 410, 424 (2006)); *see also Mahanoy Area Sch. Dist. v. B. L. by & through Levy,* 141 S. Ct. 2038, 2044-2048 (2021) (schools have a diminished interest in regulating off-campus speech as compared to on-campus speech). Such an argument would construe almost all of Dr. Pappas' speech, on or off campus, as government speech. This argument is foreclosed by the Supreme Court and would not escape the conclusion that Dr. Pappas spoke as a citizen on a matter of public concern. Thus, Dr. Pappas has carried his burden to plausibly allege a First Amendment violation at the pleading stage.

Were this at a later stage in litigation, the burden would then shift to Defendants to prove that their infringement of Dr. Pappas' free speech was justified under strict scrutiny. At this stage, however, absent any opportunity for discovery,

---

[5] At the pleading stage, it appears that the analysis should end here. *See* note 1, *supra.*

Defendants cannot meet their burden because they cannot present such evidence to the Court.

Nevertheless, Defendants may argue that their infringement was justified to avoid incurring Title IX liability (as did the government in *Kennedy*, which argued its actions were necessary to avoid Establishment Clause liability (*Kennedy*, 142 S. Ct., at 2425)). Like in *Kennedy*, this argument fails because it improperly constructs the law as if it was in conflict. It is axiomatic that a statute cannot prohibit what is constitutionally protected, and therefore the University was not, strictly speaking, in danger of Title IX liability for failing to punish Dr. Pappas for his protected speech. *See, e.g., United States v. Stevens,* 559 U.S. 460, 483-484 (2010) (explaining that a party may challenge a statute on First Amendment grounds) (Alito, J., dissenting). In other words, the University was not forced into a choice between protecting Jane Doe's Title IX rights and Dr. Pappas' First Amendment rights, as if the two laws conflicted; rather, Title IX does not prohibit protected speech, and therefore any defense rooted in avoiding Title IX liability fails.

Moreover, the Supreme Court's reasoning that the *Kennedy* plaintiff's speech was not coercive[6] is a useful analog to Defendants' argument that Dr. Pappas' speech was disruptive. *See* ECF No. 4, at 31-32. In both cases, no evidence was properly before the government to show that the speech was coercive (in the case of the

---

[6] *Kennedy*, 142 S. Ct., at 2430.

*Kennedy* plaintiff) or disruptive (in the case of Dr. Pappas). Indeed, in both scenarios, the governments relied on hearsay evidence, which the Court disfavored. *Kennedy*, 142 S. Ct., at 2430 ("This reply fails too. Not only does the District rely on hearsay to advance it…"). Further, as the Court noted, "offense does not equate to coercion," and a student's subjective offense cannot overcome Dr. Pappas' First Amendment rights. *Id.*

Finally, even assuming that Defendants have a "compelling interest," (to avoid liability or disruption) their solution is not "narrowly tailored to achieve that interest." *Reed*, 576 U.S., at 171. Defendants would discipline any speech from any employee to any student, on or off campus, that subjectively offends the student or about which the student lodges a complaint, even if the student did not allege disruption to her education. This is not a narrowly tailored effort to avoid liability or true disruption, and it cannot survive strict scrutiny.

Under the Supreme Court's reasoning in *Kennedy*, Dr. Pappas has shown a First Amendment violation. Defendants' motion to dismiss the claim should be denied.

## II. Recent decisions in Virginia federal courts support Dr. Pappas' interpretation of the Supreme Court of Virginia's Seventh Order.

In April 2022, the Eastern District of Virginia ("EDVA") addressed the tolling period articulated by the Supreme Court of Virginia in its Seventh Order. *Ceriani v. Dionysus, Inc.*, No.: 4:21cv108, 2022 WL 1185896, at *4 (E.D. Va. April 20, 2022). The EDVA observed that other courts are split in their interpretation of the tolling period

(some held that the Seventh Order only tolled statutes of limitations which ran during the tolling period; some courts held that the Seventh Order tolled all statutes of limitations for the tolling period (126 days)). *Id.* The EDVA noted: "in line with Plaintiff's interpretation of the Emergency Orders, other courts have held that if a statute of limitations or deadline was running during the Emergency Orders, the tolling provision stopped the running of the clock and allowed parties additional time to file their claim even if the statute of limitation or deadline expired outside the tolling period." *Id.* (citing *Heck v. Guion,* 108 Va. Cir. 179 (2021)); *Lutz v. Clarke*, No. 7:21-CV-00272, 2022 WL 891958, at *1 (W.D. Va. Mar. 25, 2022) (holding that a state habeas petition filed on May 10, 2021, was timely due to the Emergency Orders even though the statute of limitations would have ordinarily expired on April 30, 2021) (Dillon, J.).

*Ceriani* concluded, "[u]pon this Court's review of the Emergency Orders, the Court agrees with Plaintiff and finds that the **Emergency Orders do operate to toll Plaintiff's statute of limitations**. The language used in the Emergency Orders suggests to the Court that the Supreme Court of Virginia excluded the tolling period from any statute of limitations calculation, regardless of whether it expired during the tolling period. Notably, although the Supreme Court of Virginia provided several examples of the tolling period, none of the Emergency Orders provided an example where the statute of limitations expired outside the tolling period." *Id.* (emphasis added). Importantly, *Ceriani* explained:

> "[T]he Seventh Order Extending the Judicial Emergency,
> the Supreme Court of Virginia stated, 'there shall be no

further tolling of statutes of limitations or other case-related deadlines.' If 'toll' means to stop, then by the language of the previous orders, the statute of limitations would have been stopped, and would not be stopped any 'further.' The Seventh Order also stated that the tolling period, between 'March 16, 2020, through July 19, 2020 ... shall not be counted for purposes of determining statutes of limitation or other case related deadlines.' It did not include language as in the Second Order Extending the Judicial Emergency, limiting that period to only those statutes of limitation that expired during the tolling period. Accordingly, by the time of the Seventh Order Extending the Judicial Emergency, Plaintiff's statute of limitations had already been tolled (i.e., stopped), and that period of time is not counted for purposes of determining statutes of limitations."

*Ceriani*, at *4.

Similarly, on July 18, 2022, the Western District of Virginia addressed the tolling period of the Virginia Supreme Court's Seventh Order. *Winfree v. Hill*, No. 3:21-CV-00039, 2022 WL 2812057, at *4-5 (W.D. Va. July 18, 2022). It came to the same conclusion. *Id.* The *Winfree* court held "that the Supreme Court of Virginia's COVID-19 emergency orders operated to tolled [sic] Plaintiff's statute of limitations for 126 days, i.e., the number of days between March 16, 2020, through July 19, 2020—and that tolling occurred even though Plaintiff's statute of limitations did not expire within those dates." *Id.*

*Winfree* also discussed, at length, the problems inherent with Defendants' position. *Id.* As Dr. Pappas has argued also extensively, it noted that the Seventh Order did not include the Second Order's limiting language which only tolled statutes that would have "otherwise run" during the Second Order's duration. *Id.* The court further pointed out that applying the Second Order's limiting language to subsequent

orders would yield nonsensical results; for example, the Second Order only tolled statutes of limitations until April 26, 2020, but it is undisputed that the Supreme Court of Virginia subsequently tolled statutes of limitations until July 19, 2020. *Id.* Therefore, the Second Order's language cannot possibly be incorporated in full and must only be incorporated insofar as it is not contrary to the Seventh Order. *Id.* Finally, the court noted that Defendants' view would lead to "some anomalous results." It explained:

> For instance, if Defendants were correct that only those plaintiffs with limitations periods that were set to expire from March 16, 2020 through July 19, 2020 were beneficiaries of the tolling, that would mean that (1) a plaintiff with an earlier limitations period that would otherwise be set to expire on July 19, 2020 would get an additional 126 days to file their claim; whereas (2) a plaintiff with a later limitations period set to expire on July 20, 2020 would receive no benefit from tolling and they would have to file suit that day. In the absence of plain language from the Orders to that effect, the Court is disinclined to accept such an interpretation that would give rise to such anomalous results.

*Winfree*, at *5.

Accordingly, in addition to the plain language of the Seventh Order, the above federal cases are instructive in holding that the Seventh Order tolled all statutes of limitations during the tolling period, not only those that would have run during the tolling period.

## III.   Constructive termination is the legal equivalent of actual termination.

At oral argument, this Court inquired as to the treatment of constructive terminations in the Due Process Clause analysis, and particularly, whether property

or liberty interests were implicated by constructive termination compared to actual termination. Because courts have consistently treated constructive termination the same as actual termination, there is no change in analysis.

The Fourth Circuit holds that in order to show state action in the public employee due process analysis, a plaintiff may show actual termination or "constructive termination." *Stone v. Univ. of Maryland Med. Sys. Corp.*, 855 F.2d 167, 172-174 (4th Cir. 1988). In other words, constructive termination is another way to demonstrate "state action," rather than invoking an entirely different set of liberty or property interest analyses. *Id.* Accordingly, if a plaintiff can show they were constructively terminated, they have shown they were terminated. And, if they were terminated, they were deprived of their property or liberty interests (provided that the plaintiff possessed such interests).

*Stone* first noted that the public employee plaintiff had identified a property interest in his continued employment, and that the question before the court was whether he was actually "deprived" of that interest. *Stone,* 855 F.2d, at 172-174. It stated, among other things, that an employee may show "constructive termination" in this context where the government employer threatens termination while lacking good faith basis to believe cause for termination existed. *Id.* (*citing Schultz v. U.S. Navy,* 810 F.2d 1133, 1136 (Fed. Cir. 1987)). Were an employee to show constructive termination, the "state action" requirement is met, and the due process analysis proceeds. *Id.* In other words, whether it is actual or constructive termination, the due

process analysis, including the identification of a liberty or property interest,[7]
remains the same.

Other Circuits agree. For example, the Tenth Circuit has repeatedly considered "constructive termination" as one way a plaintiff may show that his liberty or property interests were violated. *See, e.g., Lauck v. Campbell Cnty.,* 627 F.3d 805, 813 (10th Cir. 2010) (where a public employee could only be terminated for cause, the court analyzed whether property right was "violated" by constructive termination); *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1221-1224 (10th Cir. 2000) (in non-tenured at-will employee professor case, the court analyzed whether a property or liberty interest exists before analyzing whether employee's resignation was constructive termination that "violate[d]" those interests). The Ninth and Third Circuits have engaged in similar analyses. *See Huskey v. City of San Jose*, 204 F.3d 893, 900 (9th Cir. 2000) (noting that it is "undisputed" that plaintiff had a property interest, and

---

[7] A counterfactual hypothetical illustrates the point. For example, if Dr. Pappas was a true at-will employee, meaning that he could be fired at any time for any reason or no reason at all, he would not have a property interest in continuing that employment because he would not have a "legitimate claim of entitlement to [his employment]." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972); *cf. Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538-540 (1985) (public employee who could only be terminated for cause, like Dr. Pappas, retained property interest). In this counterfactual, the University could actually terminate Dr. Pappas or constructively terminate him, and in neither scenario would due process be implicated, because there would be no property interest to deprive. This hypothetical illustrates the point that constructive termination does not affect the due process interest at stake, but rather serves as a simple alternative to actual termination in order to show deprivation or state action.

analyzing whether "he was deprived of his property interest in his job because his resignation was the result of a constructive discharge"); *Knappenberger v. City of Phoenix*, 566 F.3d 936, 941-942 (9th Cir. 2009) (noting that it was undisputed that plaintiff had a property interest in his continued employment, but holding because plaintiff failed to plausibly allege constructive discharge, he failed to allege that he was "deprived" of any liberty or property interest); *Hill v. Borough of Kutztown,* 455 F.3d 225, 238 (3d Cir. 2006) (holding that constructive termination, when shown in place of actual termination, satisfied the "stigma plus" test for a liberty interest).[8] Similarly, when discussing a plaintiff's constructive termination, the D.C. Circuit used the terms "constructive termination" and "termination" interchangeably, demonstrating that both concepts serve the same purpose in the due process analysis: showing a deprivation of rights by the government. *Thompson v. D.C.*, 967 F.3d 804 (D.C. Cir. 2020). Thus, these cases treat "constructive termination" as one legal

---

[8] In the Third Circuit, the "stigma plus" liberty interest test requires that a plaintiff show "a stigma to his reputation *plus* deprivation of some additional right or interest." *Hill,* 455 F.3d, at 236 (emphasis in original). Because reputational harm alone is not sufficient to be considered a deprivation of "liberty" (*Versarge v. Township of Clinton, New Jersey*, 984 F.2d 1359, 1371 (3d Cir.1993)), the Third Circuit incorporates the constructive termination analysis into the liberty interest analysis. But even this test differentiates between the deprivation to the plaintiff's reputation and the "additional" right that is violated by the constructive termination. Therefore, the constructive termination only serves to fill the space of actual termination and does not substantively change the liberty interest analysis. The *Hill* case itself illustrates the point, where it eventually holds that the plaintiff's "constructive discharge" satisfied the "plus" prong of the test after articulating that "*the termination* is the 'plus.'" *Hill*, 455 F.3d, at 236 (emphasis added).

theory a public employee plaintiff may utilize to show "deprivation" or "state action" in the absence of actual termination.

Courts in other contexts have reached similar conclusions. For example, the District of Maryland discussed the concept of "constructive discharge" (used herein interchangeably with "constructive termination") in the discrimination concept and held that it was not a separate claim entirely, but rather a doctrine that could be used by a plaintiff to show an "adverse employment action." *Crockett v. SRA Int'l*, 943 F. Supp. 2d 565, 576 (D. Md. 2013). Indeed, "if the requisite elements of constructive discharge are demonstrated, the Court indulges in the legal fiction that the employee's voluntary resignation was, in actuality, involuntary termination of the employee's employment by the employer." *Id.* (collecting cases).

Similarly, in the same context, the Seventh Circuit held that "a constructive discharge is the legal equivalent of a formal termination," and therefore the employee could argue that the constructive discharge was an action taken by the employer. *Health Care Indus. Liab. Ins. Program v. Momence Meadows Nursing Ctr., Inc.*, 566 F.3d 689, 697 (7th Cir. 2009). And, the Supreme Court has noted that "a constructive discharge is functionally the same as an actual termination in damages-enhancing respects" in the discrimination context. *Pennsylvania State Police v. Suders*, 542 U.S. 129, 148 (2004).

All of these authorities generally stand for the proposition that "constructive termination" is simply another way to show "termination." The other legal issues remain the same.

16

Applied to the present case, this means that if Dr. Pappas can show he was constructively terminated with respect to his due process claims, the remaining due process analyses remain unchanged and proceed as if he was actually terminated. For the reasons explained in his brief, Dr. Pappas possessed liberty and property interests,[9] and was deprived of those interests by constructive termination. With respect to qualified immunity, Defendants were on notice since the *Stone* case, decided in 1988, that a public employee is "constructively terminated" when he is threatened with termination without a good faith basis for the termination. *Stone*, 855 F.2d, at 172-174. This is sufficiently similar to Dr. Pappas' case, where Dr. Pappas was disciplined without a good faith basis for the discipline and put in a position where it was impossible for him to do the job for which he was hired. *Ray v. Roane*, 948 F.3d 222, 229 (4th Cir. 2020) ("even without directly on-point, binding authority, qualified immunity is inappropriate if the right was clearly established based on general constitutional principles or a consensus of persuasive authority"). And, indeed, he properly pleaded as such.

Finally, at the very least, a "consensus of cases of persuasive authority [exists] such that a reasonable officer" could not have believed that a constructive termination implicated due process any less than an actual termination. *Ashcroft v.*

---

[9] *See* ECF No. 7, at 23-27. For example, Dr. Pappas had a property interest in his continued term employment because he could only be terminated in accordance with the policies and procedures of the University, not for any reason or no reason at all.

*al-Kidd*, 563 U.S. 731, 746 (2011) (Kennedy, J., concurring). As argued in Dr. Pappas' opposition brief, any reasonable official in Defendants' position would have known that they were constructively terminating Dr. Pappas by depriving him of his ability to do his job. ECF No. 7, at 25-27. And, according to caselaw cited above, those officials were on notice that constructively terminating Dr. Pappas "deprived" him of his liberty or property interests in the same way as actually terminating him. Accordingly, any argument in support of qualified immunity on constructive termination grounds, fails.[10]

## CONCLUSION

For these reasons, and those articulated in oral argument and in Dr. Pappas' opposition, the Court should deny Defendants' motion to dismiss in its entirety.

Dated: July 29, 2022                    Respectfully submitted,

                                        /s/ Benjamin North
                                        Benjamin North, VSB No. 97439
                                        BINNALL LAW GROUP, PLLC
                                        717 King Street, Suite 200
                                        Alexandria, Virginia 22314
                                        Phone: (703) 888-1943
                                        Fax: (703) 888-1930
                                        Email: ben@binnall.com

                                        *Attorney for Plaintiff Eric Pappas*

---

[10] As Dr. Pappas was constructively terminated, the remainder of the due process analysis proceeds as if he was actually terminated, for reasons explained *supra.* Thus, for the reasons articulated in Dr. Pappas' opposition to Defendants' motion to dismiss (ECF No. 7, at 27-32), Defendants' deprived Dr. Pappas of his due process rights.

## CERTIFICATE OF SERVICE

I certify that on July 29, 2022, a copy of the foregoing was filed with the Clerk of the Court using the Court's CM/ECF system, which will send a copy to all counsel of record.

/s/ Benjamin North
Benjamin North, VSB No. 97439

*Attorney for Plaintiff Eric Pappas*

19