IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

DR. ERIC PAPPAS,                      )
                                      )
          Plaintiff,                  )
                                      )
v.                                    )
                                      )        Civil Action No. 5:22-cv-00028
JAMES MADISON UNIVERSITY,             )
*et al.*,                             )        By: Elizabeth K. Dillon
                                      )            United States District Judge
          Defendants.                 )

**MEMORANDUM OPINION**

Plaintiff Dr. Eric Pappas, formerly a professor at James Madison University ("JMU"),

alleges he was falsely and maliciously accused of sexual harassment by a female student and that

JMU constructively terminated him after a University hearing panel found him "responsible" for

the alleged harassment.  (Compl., Dkt. No. 1-2.)  He originally brought this suit in Rockingham

County Circuit Court against JMU and three of its employees—Amy Sirocky-Meck, David

Stringham, and Elizabeth Pass (collectively, "non-JMU defendants")—alleging violations of

Title IX, violations of his First and Fourteenth Amendment rights, and state-law claims for

breach of contract and tortious interference.  Defendants then removed the case to this court.

(Dkt. No. 1.)

Now before the court is defendants' motion to dismiss the complaint pursuant to Federal

Rules of Civil Procedure 12(b)(1) and 12(b)(6) (Dkt. No. 3), which has been fully briefed and

argued.  For the following reasons, the court will deny the motion to dismiss for lack of subject

matter jurisdiction, grant the motion to dismiss for failure to state a claim as to Counts I through

V, and decline to exercise supplemental jurisdiction over Counts VI and VII.

## I.   INTRODUCTION

### A.  Factual Background

The following facts are taken from the allegations in Dr. Pappas' complaint and, at this stage, are presumed to be true.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

In 2013, Dr. Pappas was promoted to the rank of full professor at JMU, the highest rank a non-administrative JMU employee may occupy.  (Compl. ¶ 26.)  When Dr. Pappas was initially hired, he signed an express contract with JMU (which was continuously renewed during his employment) stating, among other things, that he would only be terminated according to the "policies and procedures of JMU, including but not limited to . . . dismissal for misconduct." (*Id*. ¶¶ 29–30.)  During his time at JMU, Dr. Pappas, who was an Integrated Science and Technology professor that "[taught] problem solving using innovative developmental psychology methodologies," was beloved by his students and worked with "over a hundred student employees, research assistants, teaching assistants, and student graders."  (*Id*. ¶¶ 1, 31.) According to Dr. Pappas, student employees were "essential" for him to effectively teach his courses and conduct his active research and publishing work.  (*Id*. ¶ 32.)

From fall 2017 through fall 2018, "Jane Doe,"[1] then a JMU student, worked as a student assistant and grader for two of Dr. Pappas' classes.  (*Id*. ¶ 35.)  During the fall 2018 semester, Doe occupied the role of "lead student grader" for Dr. Pappas and worked closely with him until at least December 2018.  (*Id*. ¶¶ 36, 46.)  Dr. Pappas alleges that Doe has "an ideological interest in filing Title IX complaints against male figures at [JMU]."  (*Id*. ¶ 37.)

---

[1]  For confidentiality purposes, Dr. Pappas refers to several individuals, including the accusing student, only by a pseudonym or abbreviation, though the parties to this case are aware of the identities of these individuals.

On June 25, 2019, Doe filed a Title IX complaint against Dr. Pappas, alleging that he sexually harassed her during the spring 2018 semester.  (*Id.* ¶ 38.)  Specifically, according to Doe's Title IX complaint, during a conversation with Doe at an off-campus coffee shop on May 11, 2018, Dr. Pappas allegedly told her "that he had met some of his previous girlfriends when they were first students in his class and that a friendship had developed which later lead [sic] to a dating relationship,"[2]  told her that he had never dated anyone over the age of 30, told her that he "couldn't imagine being with one woman sexually and romantically for the rest of his life," and "spoke about the benefits of dating someone older."  (Dkt. No. 4-4 at 2, 6–7.)[3]  Dr. Pappas characterized these allegations as "sexual comments in the abstract."  (Compl. ¶ 39.)  Doe's Title IX complaint also alleged that Dr. Pappas had sexually harassed other students and engaged in a romantic relationship with one of his students, "C.B."  (*Id.* ¶¶ 40–41.)  Dr. Pappas asserts that Doe fabricated those accounts, that he has never sexually harassed Doe or any other student, and that he has never engaged in a sexual relationship with a student.  (*Id.* ¶¶ 42–43.)  According to Dr. Pappas, after filing her Title IX complaint, Doe engaged in "an aggressive campaign to recruit other accusers" through text messages and social media and published an op-ed detailing her accusations "in order to advocate for [fewer] due process protections on campus."  (*Id.* ¶¶ 44–45.)

At the time Doe filed her Title IX complaint, Amy Sirocky-Meck was JMU's Title IX Coordinator.  (*Id.* ¶ 3.)  JMU uses a Single Investigator Model to conduct its investigations, whereby JMU assigns an investigator to bring the charges, investigate the matter, and make an

---

[2]  In her complaint, Doe expressed that she was uncertain whether Dr. Pappas was allegedly referring to former students who later became romantic partners after graduation or people who were his romantic partners while they were students.

[3]  For reasons explained herein, the court will give limited consideration to Doe's Title IX complaint, as well as several other extrinsic documents.

initial determination as to the findings.  (*Id.* ¶ 51.)  JMU policies afforded Dr. Pappas the right to be presumed "not responsible" throughout the investigation and adjudication.  (*Id.* ¶ 50.)

Sirocky-Meck "approved" Doe's complaint and began a Title IX investigation (the "disciplinary case").  (*Id.* ¶ 55.)  According to Dr. Pappas, instead of conducting an initial assessment of the complaint (as he alleges is required by University Policy 1340), Sirocky-Meck accepted Doe's statements as true and assumed that, if proven, her allegations would violate the policy.  (*Id.* ¶¶ 47–48.)  She also did not offer Dr. Pappas a meeting to discuss possible interim supportive measures, as apparently required by the policy.  (*Id.* ¶¶ 56–57.)

On or around July 26, 2019, Sirocky-Meck notified Dr. Pappas of Doe's formal complaint and instituted mutual no-contact orders that prohibited Dr. Pappas and Doe from having any contact directly or through third parties.  (*Id.* ¶ 58.)  Sirocky-Meck charged Dr. Pappas with "hostile environment sexual harassment," which JMU defines as, in relevant part, conduct of a sexual nature that "is so severe, pervasive . . . and objectively offensive . . . that it denies the ability of a person's ability to participate . . . in the institution's educational programs."  (*Id.* ¶¶ 48–49.)  Dr. Pappas alleges that this charge was inappropriate because Doe did not present any evidence that she had been deprived of her "ability to participate in the institution's educational programs."  (*See id.* ¶¶ 52–55.)  In support, Dr. Pappas notes that Doe "received stellar performance reviews from her students during the Fall 2018 semester – averaging ratings [of] 4.7 out of 5," which he says demonstrates "that she had not suffered any educational deprivation." (*Id.* ¶ 54.)

Dr. Pappas claims that Sirocky-Meck's investigation was deficient in several respects. According to Dr. Pappas, JMU policy requires that Title IX investigations be conducted in an impartial and unbiased manner and requires the exclusion of irrelevant evidence or evidence that

is not "appropriate" given the facts alleged.  (*Id.* ¶ 59.)  During her investigation of Jane Doe's complaint, Sirocky-Meck did not speak with any non-party witnesses with any personal knowledge of the root of Doe's complaint: the May 11, 2018, off-campus coffee shop conversation.  (*Id.* ¶ 60.)  Instead, Sirocky-Meck accepted statements submitted by Doe that purported to be from other students who said they suffered sexual harassment by Dr. Pappas— allegations which Dr. Pappas also denied.  (*Id.* ¶ 61.)  Dr. Pappas submits that JMU policy requires that a complaint submitted on behalf of another be designated a "third party complaint" and be subject to special timeliness requirements.  (*Id*. ¶ 62.)  However, Sirocky-Meck never designated the portions of Doe's complaint that alleged sexual harassment on behalf of others as a "third party complaint," nor did she engage in any timeliness analysis, even though portions of Doe's complaint alleged sexual harassment suffered by others multiple years earlier.  (*Id.* ¶¶ 63– 64.)

Sirocky-Meck contacted some of the students referenced in Doe's complaint and requested to interview them.  (*Id.* ¶ 66.)  Out of all the students contacted, only one student responded in support of Doe: "Jane Roe," one of Doe's close friends.  (*Id.* ¶¶ 66–67.)  Sirocky-Meck "uncritically accepted" the third-party accounts from students such as Roe and added them to the investigation file, despite them having no relevance to Jane Doe's allegations.  (*Id.* ¶¶ 68– 69.)  By contrast, Dr. Pappas submitted over 16 verified statements from his student graders who worked with him and Doe, each of whom testified that, to their knowledge, Dr. Pappas did not sexually harass Doe or anyone else; Sirocky-Meck deemed these accounts to be "not relevant" or otherwise excluded them.  (*Id.* ¶¶ 70–71.)  Dr. Pappas also submitted 18 support letters from student graders who worked for him during the time Doe was employed, purporting to demonstrate that nobody, including Doe, raised any issues of sexual harassment; Sirocky-Meck

excluded these statements over concerns of student privacy, despite Dr. Pappas' offer to redact the names of the students involved.  (*Id.* ¶ 72.)  By contrast, Sirocky-Meck never raised issues of student privacy with Doe's submissions of other students' false allegations against Dr. Pappas and included those students' names.  (*Id.* ¶ 73.)

One JMU student, "E.M.," discovered that Doe had fabricated an allegation of sexual allegation purportedly on her behalf.  (*Id.* ¶ 74.)  E.M. contacted Sirocky-Meck and stated that she had no allegation of sexual harassment against Dr. Pappas, that he had been nothing but professional with her, and that Doe's complaint on her behalf was false.  (*Id.* ¶ 75.)  However, Sirocky-Meck credited Doe's original report on E.M.'s behalf instead of E.M.'s own statements that she had no complaint against Dr. Pappas.  (*Id.* ¶ 76.)  Another student, "K.S.," similarly discovered that Doe had fabricated allegations on her behalf.  (*Id.* ¶ 77.)  K.S. submitted three statements to Sirocky-Meck explaining that Doe's statement on her behalf was false and, further, that Doe's statements alleging a romantic relationship between Dr. Pappas and C.B. were false. (*Id.*)  Nevertheless, Sirocky-Meck credited Doe's allegations on K.S.'s behalf in lieu of K.S.' own statements.  (*Id.* ¶ 78.)

Sirocky-Meck made an "initial determination" that Dr. Pappas had committed sexual harassment and set the matter for a hearing.  (*Id.* ¶ 79.)  Following this initial determination, Dr. Pappas submitted a statement contesting Doe's complaint and highlighting alleged contradictions in Doe's statements.  (*Id.* ¶ 85.)  On or around September 16, 2019, Dr. Pappas inquired about the possibility of settling the case through mediation (which he alleges is provided for by JMU policy).  (*Id.* ¶¶ 80–81.)  Sirocky-Meck responded to Dr. Pappas that JMU would not facilitate any mediation, but that Dr. Pappas could settle privately with Doe.  (*Id.* ¶ 82.)  When Sirocky-Meck made this statement, she knew that she had already put in place no-contact orders which

would make private mediation with Doe impossible—such that if Dr. Pappas were to reach out to try to privately settle with Doe, he would subject himself to disciplinary action for communicating with her.  (*Id.* ¶ 83.)

Per JMU policy, the University convened a hearing panel for Dr. Pappas' disciplinary case.  (*Id.* ¶ 86.)  According to Dr. Pappas, a "controlling majority" of the three-member hearing panel was biased against him.  (*Id.* ¶¶ 88–91.)  First, Dr. Pappas alleges that Stringham, the hearing panel chair, has a bias against men; in support, Dr. Pappas avers that Stringham has "endorsed" a podcast titled "Scene on Radio MEN'" which "has as its description, in relevant part, "What's up with this male-dominated world? How did we get sexism, patriarchy, misogyny in the first place? How can we get better at seeing it, and what can we do about it?"  (*Id.* ¶ 88.) Additionally, Dr. Pappas claims that Elizabeth Pass, another hearing panel member, sat on the University's Diversity Council and participated in meetings "wherein the Council advocates for greater protection for female students and complains that the University's efforts to protect female students are not reflected in critical media reports," yet "has never argued for greater protection for male members of the University community."  (*Id.* ¶¶ 89–90.)

Dr. Pappas' hearing was held on October 23, 2019.  (*Id.* ¶ 84.)  The hearing panel advised that parties' attorneys and advisors were not to speak during the proceeding, except to advise their clients privately.  (*Id.* ¶ 92.)  Neither Jane Doe nor any of her witnesses attended the hearing.  (*Id.* ¶¶ 93–94.)  As a result, Dr. Pappas was not permitted to ask any questions of Doe or of any witness, to test their credibility or for any other purpose.  (*Id.* ¶ 95.)  None of the parties' or witnesses' statements were made under oath at any point in the University's investigation process.  (*Id.* ¶ 96.)

Sirocky-Meck testified at the hearing to her initial determination that Dr. Pappas violated

JMU policy.  (*Id.* ¶ 97.)  She further testified that she did not speak to any of Doe's witnesses to verify the complaint and did not speak to any witnesses who had firsthand knowledge of the May 11, 2018, off-campus, coffee shop meeting.  (*Id.* ¶ 98.)  The hearing panel reviewed statements from E.M. and K.S., which Dr. Pappas claims demonstrated that Doe had lied about reports they supposedly had made.  (*Id.* ¶ 99.)  The hearing panel found Doe credible, without hearing from her, and found Dr. Pappas not credible, despite having heard from him.  (*Id.* ¶ 100.)

Ultimately, on or around October 28, 2019, approximately five days after the hearing, the hearing panel reached its decision, recommending that Dr. Pappas be found "responsible" for Doe's allegations.  (*Id.* ¶¶ 101–02.)  Dr. Pappas alleges he submitted two appeals of the hearing panel's decision—one to a Dean and one to the Provost, respectively.  (*Id.* ¶ 103.)  Both the Dean and the Provost summarily denied Dr. Pappas' appeal "without substantive discussion of his arguments."  (*Id.* ¶ 104.)  The final appeal was denied on December 10, 2019, and the findings and sanctions were then made final.  (*Id.* ¶ 105.)

After being found "responsible" for sexual harassment, Dr. Pappas was permanently barred from working with student assistants for the remainder of his employment with JMU.  (*Id.* ¶ 106.)  Dr. Pappas claims this sanction made it "impossible" for him to do his job because his high course load—including several courses containing hundreds of students—required the active participation of student assistants.  (*Id.* ¶ 107.)  Dr. Pappas' research program required student researchers and assistants; without those assistants, he became ineligible for key research grants.  (*Id.* ¶¶ 108.)

As a result of these consequences, Dr. Pappas contends he was "forced to resign."  (*Id.* ¶ 109.)  Dr. Pappas further alleges that, because of JMU's finding (which he maintains was wrongful), he suffered severe emotional and psychological harm and had been attending

psychotherapy for several months at the time he filed this action.  (*Id.* ¶ 110.)  Further, Dr.

Pappas alleges that JMU's finding caused him severe financial harm because it effectively bars

him from future employment in any other educational institution or any professional consulting

work that requires letters of recommendation from past employers.  (*Id.* ¶ 111.)  Additionally,

because Dr. Pappas' case has been discussed on JMU's Reddit message board website, his name

is now easily searchable and associated with Doe's allegations and the University's finding.  (*Id.*

¶ 112.)  Lastly, Doe, Roe, and other female JMU students started a petition to get Dr. Pappas

banned from campus and to have him prevented from being in physical proximity to a female;

they also wrote to his landlord to have him evicted.  (*Id.* ¶ 116.)  It's alleged that JMU did not act

to prevent or remedy these actions.  (*Id.*)

## B.  Procedural History

On February 23, 2022, Dr. Pappas filed this action in Rockingham County Circuit Court

against JMU, Sirocky-Meck (in her official and individual capacities), Stringham (only in his

individual capacity), and Pass (only in her individual capacity).  (Dkt. No. 1-2.)  His complaint

asserts seven causes of action:

- Count I: Title IX claim (against JMU);

- Count II: Fourteenth Amendment procedural due process based on both a property
  interest and a liberty interest (against non-JMU defendants in their individual
  capacities);

- Count III: Fourteenth Amendment procedural due process based on both a property
  interest and a liberty interest (against Sirocky-Meck in her official capacity);

- Count IV: First Amendment free speech (against non-JMU defendants in their
  individual capacities);

- Count V: First Amendment free speech (against Sirocky-Meck in her official
  capacity);

- Count VI: state-law breach of contract (against JMU); and

- Count VII: state-law tortious interference with contractual relations (against Sirocky-Meck in her individual capacity).

On May 17, 2022, defendants removed the case to this court (Dkt. No. 1) and filed the instant motion to dismiss (Dkt. No. 3), arguing (1) that most of Dr. Pappas' claims are untimely and thus barred by the statute of limitations; (2) that the complaint fails to state a claim under any legal theory; (3) that the non-JMU defendants are entitled to qualified immunity; and (4) that the official-capacity and breach-of-contract claims are barred by sovereign immunity.  (Dkt. No. 4 at 2.)

## II.  STANDARD OF REVIEW

### A.  Motion to Dismiss for Failure to State a Claim, Including Consideration of the Statute of Limitations

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff's allegations must "state a claim to relief that is plausible on its face."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). This standard "requires the plaintiff to articulate facts, when accepted as true, that 'show' that the plaintiff has stated a claim entitling him to relief, i.e., the 'plausibility of entitlement to relief.'" *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678).  The plausibility standard requires more than "a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678.

In determining whether the plaintiff has met this plausibility standard, the court must accept as true all well-pleaded facts in the complaint and any documents incorporated into or attached to it.  *Sec'y of State for Defence v. Trimble Navigation Ltd*., 484 F.3d 700, 705 (4th Cir. 2007).  Further, it must "draw[] all reasonable factual inferences from those facts in the plaintiff's favor," *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999), but it "need not accept legal conclusions couched as facts or 'unwarranted inferences, unreasonable

10

conclusions, or arguments,'" *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012)

(quoting *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008)).

As already noted, defendants argue that many of Pappas' claims are time barred.  The

raising of the statute of limitations as a bar to a plaintiff's cause of action constitutes an

affirmative defense that may be raised in a motion to dismiss under Rule 12(b)(6).  *United States*

*v. Kivanc*, 714 F.3d 782, 789 (4th Cir. 2013) (citing *Dean v. Pilgrim's Pride Corp*, 395 F.3d 471,

474 (4th Cir. 2005)).  While a Rule 12(b)(6) motion "invites an inquiry into the legal sufficiency

of the complaint, not an analysis of potential defenses to the claims set forth therein, dismissal

nevertheless is appropriate when the face of the complaint clearly reveals the existence of a

meritorious affirmative defense." *Brockington v. Boykins*, 637 F.3d 503, 506 (4th Cir. 2011)

(internal citations and quotations omitted).

**B.  Motion to Dismiss for Lack of Subject Matter Jurisdiction**

Under Federal Rule of Civil Procedure 12(b)(1), a defendant may move for dismissal

when the court lacks subject-matter jurisdiction over the action.  Fed. R. Civ. P. 12(b)(1).

Generally speaking, a federal court has subject-matter jurisdiction over a claim only if it raises a

question of federal law, 28 U.S.C. § 1331, if it is between citizens of different states with an

amount in controversy exceeding $75,000, *id*. § 1332, or—when both federal-question and

diversity jurisdiction are lacking—if it is so related to another claim within the court's

jurisdiction in the same action that they "form part of the same case or controversy," *id.* §

1367(a).  The plaintiff bears the burden of proving that subject-matter jurisdiction exists.  *Evans*

*v. B.F. Perkins Co*., 166 F.3d 642, 647 (4th Cir. 1999).  If he cannot do so, then the court must

dismiss his complaint.  *Arbaugh v. Y & H Corp*., 546 U.S. 500, 514 (2006).

Assertions of sovereign immunity must also be addressed on a motion to dismiss for lack of subject matter jurisdiction because sovereign immunity "deprives federal courts of jurisdiction to hear claims" against the immune party.  *See Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2000).  The doctrine of sovereign immunity under the Eleventh Amendment generally prohibits actions in federal court by individuals against a state.  *Ballenger v. Owens*, 352 F.3d 842, 844–45 (4th Cir. 2003).  Eleventh Amendment sovereign immunity also applies to state agencies, agents, and instrumentalities that act as an arm of the state.  *See Regents of Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997) (explaining that the Eleventh Amendment's reference to actions "against one of the United States" encompasses "not only actions in which a State is actually named as the defendant, but also certain actions against state agents and state instrumentalities").

## III.  ANALYSIS

### A.  Consideration of Documents Outside of the Pleadings

Defendants attached several documents to their motion to dismiss that were not attached to Dr. Pappas' complaint and now ask the court to consider those documents in reaching its decision.  Those documents are:

(1) the written decisions of Dean Cynthia Bauerle and Provost/Senior Vice President for Academic Affairs Heather Coltman at JMU in Dr. Pappas' disciplinary case (Dkt. No. 4-1 ["Dean & Provost Decisions" or "Exhibit A"]);

(2) the Judicial Emergency Orders of the Supreme Court of Virginia (Dkt. No. 4-2 ["SCOVA Orders" or "Exhibit B"]);

(3) the sexual misconduct policy of JMU's Title IX Office that was in effect at the time of the events giving rise to this suit (Dkt. No. 4-3 ["Policy 1340" or "Exhibit C"]);

(4) Jane Doe's initial sexual harassment complaint to Sirocky-Meck (Dkt. No. 4-4 ["Doe Compl." or "Exhibit D"]);

(5) Jane Roe's statement (Dkt. No. 4-5 ["Roe Statement" or 'Exhibit E"]); and

12

(6) An employment agreement between Dr. Pappas and JMU, to run from August 25, 2008, through June 30, 2009 (Dkt. No. 4-6 ["Pappas Contract" or "Exhibit F"]).

Before turning to the merits of the motion, the court must first determine which extrinsic documents, if any, may be considered in ruling on the motion and how the court must regard the facts raised in those documents, given its obligation to accept as true the well-pleaded allegations in the complaint.

At this stage, courts should generally "focus their inquiry on the sufficiency of the facts relied upon by the plaintiff[] in the complaint." *Zak v. Chelsea Therapeutics Int'l, Ltd*., 780 F.3d 597, 606 (4th Cir. 2015).  Thus, a court is generally "limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'"  *Id*. (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc*, 637 F.3d 435, 448 (4th Cir. 2011)).  If a court goes beyond these documents during the pleading stage, then it risks "improperly convert[ing] the motion to dismiss into a motion for summary judgment."  *Zak*, 780 F.3d at 606.[4]

However, there are exceptions to this general rule.  For example, the court "may consider a document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity."  *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016).  A "necessary prerequisite" for such finding is the "plaintiff's *reliance* on the terms and effect of a document in drafting the complaint."  *Chambers v. Time Warner, Inc*., 282 F.3d 147,

---

[4]  Additionally, "statements by counsel that raise new facts constitute matters beyond the pleadings and cannot be considered on a Rule 12(b)(6) motion."  *Kolon*, 637 F.3d at 449.  For example, at the hearing, counsel for JMU stated that the subject of the May 11, 2018 coffee shop meeting between Pappas and Doe was her role as Pappas' lead grader for fall 2018, but conceded that the complaint does not specifically say this.  (*See* Hr'g Tr., Dkt. No. 15 at 3.)  To the extent any new facts were presented at oral argument but not otherwise properly alleged, they will not be considered.

153 (2d Cir. 2002) (emphasis in original), *cited with approval in Goines*, 822 F.3d at 166; *see also Am. Chiropractic Ass'n v. Trigon Healthcare, Inc*., 367 F.3d 212, 234 (4th Cir. 2004) (explaining that the "rationale underlying this exception is that the primary problem raised by looking to documents outside the complaint – lack of notice to the plaintiff – is dissipated where plaintiff has actual notice . . . *and has relied upon these documents in framing the complaint*") (emphasis added).

During the hearing, the court asked counsel to clarify the parties' respective positions as to which documents it could consider.  Defendants, as the proponent of these documents, predictably submitted that they all can be considered (Hr'g Tr. 4–5), and Dr. Pappas conceded that Exhibits B (the orders of the Supreme Court of Virginia), C (the University's sexual harassment policy), and F (his employment contract with JMU) are authentic and integral to the complaint for purposes of the court's review (*id.* 8).[5]  Thus, the only documents that Dr. Pappas maintains cannot be considered are Exhibits A (Dean Bauerle and Provost Coltman's decisions), D (Doe's complaint in Dr. Pappas' disciplinary case), and E (Roe's statement).[6]  The court concludes that it is appropriate to consider Exhibits A and D in ruling on the motion to dismiss, but not Exhibit E.

Exhibit A is integral to the complaint in several respects.  In the complaint, Dr. Pappas notes that the Dean and Provost "summarily" reached their decisions "without substantive discussion of his arguments."  (Compl. ¶ 104.)  Dr. Pappas repeatedly refers to the University's "wrongful" and "erroneous finding" (*e.g.*, *id.* ¶¶ 110, 114) and discusses the career and personal

---

[5]  In his memorandum in opposition to defendants' motion, Dr. Pappas also attached a declaration from his counsel, Benjamin North, to respond to defendants' argument on brief that Dr. Pappas failed to comply with state law by properly noticing JMU's president before he brought his state-law pecuniary breach-of-contract claim.  (*See* Dkt. No. 7-1.)  At the hearing, defendants assured the court that they have no objection to the court's consideration of Mr. North's declaration (*see* Hr'g Tr. 4–5), so the court will consider it to the extent it is relevant to the issues.

[6]  Dr. Pappas has not challenged the authenticity of these documents.

impact of the sanctions imposed (*id.* ¶¶ 106–112), all of which were conclusions reached by Dean Bauerle.  Looking to the claims themselves, Count I of the complaint (alleging a violation of Title IX against JMU), for example, alleges that JMU made an "erroneous determination that [Dr. Pappas] committed sexual offenses."  (*Id.* ¶ 135.)  The thrust of Dr. Pappas' claims is that Doe's allegations were partially fabricated and that JMU's decision erroneously accepted them as true.  As such, Dr. Pappas has evidently relied upon Exhibit A in framing the complaint, and the court will consider it in reaching its decision.

Dr. Pappas relies even more heavily upon Exhibit D.  Indeed, a section of his complaint (entitled "Jane Doe's Title IX Complaint") explicitly recalls Doe's allegations from the document itself—including the time, date, and location of the allegedly harassing conversation, the nature of the topics discussed, as well as additional allegations of harassment by Dr. Pappas of other students on earlier occasions—and maintains that he has never sexually harassed anyone.  (Compl. ¶¶ 38–43.)  Moreover, Doe's Title IX complaint forms the basis for the bulk of Dr. Pappas' due process and First Amendment claims against Sirocky-Meck; he alleges that she blindly "accepted Jane Doe's statements as true" (*id.* ¶ 48), that she did not abide by JMU policy in failing to designate the "portions of Jane Doe's complaint that alleged sexual harassment on behalf of others" as a "third party complaint" and in failing to engage in a timeliness analysis (*id.* ¶¶ 63–64), and that she credited the allegations in Doe's complaint over that of another student (*id.* ¶¶ 77–78), all in deprivation of his due process and free speech rights.  The document is doubtless integral to Dr. Pappas' complaint, and although Dr. Pappas properly disputes Doe allegation that he committed sexual assault, he does not dispute the authenticity of the document itself.

Lastly, the court will not consider Exhibit E because it is not integral to the complaint. Although the complaint mentions Jane Roe's statement, it does not purport to incorporate its words; rather, it simply states that Roe submitted a statement in support of Jane Doe and that Sirocky-Meck "uncritically" accepted the statement and added it to the investigation file "despite [it] having no relevance to Jane Doe's allegations." (*Id.* ¶¶ 66–69.) Further, it cannot be said that Dr. Pappas "framed" the complaint around Roe's statement, as he alleges that Roe was just one of several students who wrote letters in support of Doe.

## B.  Applicability of the "Exhibit-Prevails" Rule to the Extrinsic Documents

The more critical question here, however, is how the court is to treat the factual contents of these extrinsic documents, particularly those that conflict with allegations in Dr. Pappas' complaint. Generally, "in the event of conflict between the bare allegations of the complaint and any exhibit attached . . . , the exhibit prevails." *Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991). "Under the rule, if a plaintiff attaches documents and relies upon the documents to form the basis for a claim or part of a claim, dismissal is appropriate if the document negates the claim." *Goines*, 822 F.3d at 166 (internal quotations and citation omitted). The principle underlying this "exhibit-prevails" rule is "the presumption that the plaintiff, by basing his claim on the attached document, has adopted as true the contents of that document." *Id.* at 167.

But "[p]laintiffs attach exhibits to their complaints for all sorts of reasons," and "it is not always appropriate to conclude that the plaintiff has adopted the contents of an attached document." *Id.* (citations omitted). In *Goines*, the Fourth Circuit instructed that "[i]n cases where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.* "The

purpose for which the document is offered is particularly important where the document is one prepared by or for the defendant." *Id.* at 168. "Such unilateral documents may reflect the defendant's version of contested events or contain self-serving, exculpatory statements that are unlikely to have been adopted by the plaintiff." *Id.* "Treating the contents of such a document as true simply because it was attached to or relied upon in the complaint, even though the plaintiff relied on it for purposes other than truthfulness, would be contrary to the concept of notice pleading and would enable parties to hide behind untested, self-serving assertions." *Id.* (internal quotations omitted).

Two of the documents at issue here—the Dean and Provost decisions, as well as Doe's Title IX complaint—were prepared by parties adverse to Dr. Pappas (either in this case or in the JMU disciplinary case) and include assertions with which Dr. Pappas openly disagrees (in particular, that he sexually harassed other students and was in a romantic relationship with C.B.). With respect to the Title IX and due process claims (Counts I through III), no portion of those causes of action are "dependent upon the truth" of any statements contained in these documents. *See Goines*, 822 F.3d at 168. Instead, Dr. Pappas' complaint simply "tells the story" of JMU's allegedly unfair disciplinary process that he says generally reflected bias against him. *See id.* "Thus, when the complaint is read in the light most favorable" to Dr. Pappas and "in light of his theory of the case" as to those counts, it is apparent that his purpose in extensively referring to Doe's complaint and the findings of the hearing panel (relied upon by Dean Bauerle) was not to assert the truth of their contents, but instead to illustrate the missteps he believes were made by JMU and its employees. *See id.* Accordingly, when the court analyzes Counts I through III, it will treat these exhibits only "as what they were"—documents prepared by parties adverse to Dr.

Pappas representing their own views of what he did, not representing independent facts that the court would be bound to accept as true.  *See id.*

However, with respect to the First Amendment claims (Counts IV and V), these questions become far more complicated.  This is because a close reading of the complaint reveals that it alleges nothing about what Dr. Pappas *actually* said to Jane Doe at the off-campus coffee shop on May 11, 2018—only that *Doe claims* he said certain things.  (*See, e.g.*, Compl. ¶ 39 (referring to Jane Doe's "only allegation with any specificity" in which "*she contends* that Dr. Pappas made sexual comments in the abstract" (emphasis added).)  And specifically in the sections of the complaint that claim violations of the First Amendment, Dr. Pappas refers directly to his "*alleged* comments about sex in the abstract and sexual norms" (again, "alleged" meaning as recounted by Doe) and argues that those comments "*even if made*, were protected speech" and that "[*i*]*f made*, [he] made *those comments* as a citizen and not as an employee.  (*See id.* ¶¶ 163, 173 (emphasis added); *see also id.* ¶¶ 164, 174 ("No part of Dr. Pappas's *alleged speech* amounted to a true threat or any other exception to the broad protection of the First Amendment) (emphasis added).)  To summarize, on numerous occasions in the complaint, Dr. Pappas relies on Jane Doe's recitation of what he said at the coffee shop, adds the gloss that his comments were "in the abstract," and argues that even assuming he said what Doe claims he said, his First Amendment rights were violated.  In other words, the complaint only speaks to what Doe alleged in her Title IX document, and defendants have now introduced that document as an exhibit.

Accordingly, when the court analyzes Counts IV and V, it must assume that Doe's allegations regarding what Dr. Pappas said at the coffee shop are true—because *the complaint itself* already assumes that they are true for purposes of the First Amendment claims.[7]  And to the

---

[7] Of course, to the extent Doe's complaint alleges that Dr. Pappas' alleged comments amounted to sexual harassment, that is a conclusion not entitled to the presumption of truth.

extent that the complaint conflicts with the exhibit on this issue, the exhibit-prevails rule continues to apply.[8]

As for the remaining documents (the orders of the Supreme Court of Virginia, JMU Policy 1340, and Dr. Pappas' employment contract), the court will treat their contents as true because it is clear from the context in which they were referenced in the complaint that Dr. Pappas intended to assert that these documents were accurate. For example, the complaint cites extensively to Policy 1340 to demonstrate that JMU and its employees were not following applicable University policy throughout the investigation (*see, e.g.*, Compl. ¶ 47), making it clear Dr. Pappas intended to allege that this indeed was the JMU policy that would have been applicable to University actors at the time. He also refers directly to his "express contract" with JMU and its limitations on how he could be terminated (*see id.* ¶ 29), indicating he means to allege that this contract does reflect his employment relationship with JMU at the time he was found responsible for sexual harassment. Because neither party contests the authenticity of these documents and Dr. Pappas refers to them for their truth value, the court may likewise accept their contents as true.

## C. Statute of Limitations (Counts I Through V)

Defendants argue that Dr. Pappas failed to file his federal claims under Title IX and § 1983 (Counts I through V) within the applicable statute of limitations, meaning those claims are

---

[8] What the exception to the extrinsic-documents rule seeks to prevent "is the situation in which a plaintiff is able to," for example, "maintain a claim of fraud by extracting an isolated statement from a document and placing it in the complaint, even though if the statement were examined in the full context of the document, it would be clear that the statement was not fraudulent." *Am. Chiropractic Ass'n*, 367 F.3d at 234 (quotations omitted). In *American Chiropractic Association*, the plaintiff explicitly referred to an agreement and some of its claims were based on "the alleged misrepresentation in that document." *Id.* The Fourth Circuit determined that the documents were integral to the complaint and properly considered on defendant's motion to dismiss for failure to state a claim. *Id.* Similarly, Dr. Pappas points to deficiencies in the decisions finding him responsible for sexual harassment, in Sirocky-Meck's alleged noncompliance with University policy, and in Doe's statement as a basis for his Title IX claim (if not his other federal claims).

time barred.  The parties agree that both Title IX and § 1983 borrow the forum state's personal injury statute of limitations: in Virginia, that is two years.  *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 388 (4th Cir. 2014) (§ 1983); *Doe v. Va. Polytechnic Inst. & State Univ.*, 400 F. Supp. 3d 479, 496 (W.D. Va. 2019) (Title IX).  Accrual of a cause of action is governed by federal law, which provides that "a cause of action accrues when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action."  *Nasim v. Warden, Md. House of Corr.*, 64 F.3d 951, 955 (4th Cir. 1995).

In the present case, the federal causes of action accrued when Dean Bauerle issued the final decision finding Dr. Pappas responsible for sexual harassment.  As clarified by University Policy 1340, the hearing panel's decision was merely a recommended finding, subject to the final decision of the Dean.  (*See* Policy 1340 §§ 6.6.8.15 (stating that the chair of the hearing panel is required to communicate the Panel's "decision and recommendations" in writing to the Title IX Coordinator); 6.6.8.16 (requiring the Dean to send a "written decision in the case" to the reporter and respondent "[w]ithin ten days of receipt of the panel's recommendations").)  Thus, the University did not formally render its decision in the disciplinary case until Dean Bauerle adopted the panel's recommendations.  As such, the date of Dean Bauerle's decision is the operative date for purposes of the statute of limitations.  *Accord Doe*, 400 F. Supp. 3d at 493 ("[T]he court concludes that the limitations period for plaintiffs' [due process] claims began, and the claim accrued, at the time of the initial decision . . . ."); *id*. at 494 (holding that, as to plaintiffs' Title IX claims, the court was adopting "the same reasoning and conclusion that it reached with regard to plaintiffs' due process claims").  The date on which the Provost denied Dr. Pappas' appeal of that decision is of no consequence here.  *See Del. State Coll. v. Ricks*, 449 U.S. 250, 261 (1980) ("[E]ntertaining a grievance . . . does not suggest that the earlier decision

was in any respect tentative. The grievance procedure, by its nature, is a remedy for a prior decision, not an opportunity to influence that decision before it is made."); *Doe*, 400 F. Supp. 3d at 490–91.

Dean Bauerle's written decision was dated November 11, 2019.  (*See* Dean & Provost's Decisions 4.)  Absent tolling, the two-year statute of limitations would thus have expired on November 11, 2021, but Dr. Pappas did not file this action until February 23, 2022.  Therefore, unless the limitations period was tolled for approximately 104 days, Dr. Pappas' § 1983 and Title IX claims are time barred.

When a federal court applies a state's statute of limitations, it is also obliged to "apply the State's rule for tolling that statute of limitations."  *Scoggins v. Douglas*, 760 F.2d 535, 537 (4th Cir. 1985).  When the COVID-19 pandemic began, the Supreme Court of Virginia issued several "judicial emergency orders" that tolled statutes of limitations that "ran" from March 16, 2020, through July 19, 2020.  Although courts have split over whether the tolling applied to all causes of action (as Dr. Pappas claims) or only those for which the statute of limitations expired during the tolling period (as defendants argue), the Court of Appeals of Virginia recently resolved that question in Dr. Pappas' favor.  *See English v. Quinn*, 880 S.E.2d 35, 39 (Va. Ct. App. 2022) ("[T]he plain language of the judicial emergency orders 'stopp[ed] the limitations clock' for all statutes of limitations between March 16, 2020, and July 19, 2020. By their clear and express terms, the orders' tolling provisions were not limited to deadlines that otherwise would have expired during that period.").  Thus, the applicable limitations period was tolled for 126 days, and Dr. Pappas' federal claims were therefore timely filed.  As such, his claims are not barred by the statute of limitations.

### D.  Count I: Title IX (Against JMU)

Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). It is enforceable through an implied private right of action. *Cannon v. Univ. of Chi.*, 441 U.S. 677, 703 (1979). Title IX's protections extend to sex-motivated discrimination in university disciplinary hearings. *See Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 235–37 (4th Cir. 2021).

In *Sheppard*, the Fourth Circuit clarified that in order for a plaintiff to state a plausible claim to relief under Title IX in this context, the plaintiff must allege facts that, if true, would "raise a plausible inference that the university discriminated against [the person] on the basis of sex." *Id*. The *Sheppard* court explained that this approach—first articulated by the Seventh Circuit—closely tracked Title IX's text. *Id*. The Fourth Circuit adopted that standard (previously adopted by the Third, Seventh, Eighth, and Ninth Circuits), rather than Second Circuit's "erroneous outcome" and "selective enforcement" theories of liability, though it noted that there were "no inherent problems" with those theories and that "either theory, with sufficient facts, may suffice to state a plausible claim." *Id*. However, the court "emphasize[d] that the text of Title IX prohibits all discrimination on the basis of sex." *Id*.

The *Sheppard* court further explained that a Title IX plaintiff must establish a "causal link between the [person's] sex and the university's challenged disciplinary proceeding," to prevail on a Title IX claim, and that the statute requires a showing of "but-for" causation. *Id*. In other words, the plaintiff must show that sex was the "but-for" cause of the university's challenged disciplinary action. *Id*.

### 1. External pressure on JMU

Dr. Pappas' complaint contains both specific allegations regarding JMU's investigation and adjudication of Doe's complaint against him (as summarized earlier) and general allegations regarding the climate surrounding sexual misconduct at JMU. The general allegations summarize alleged external pressures on JMU relating to sexual misconduct toward women to provide a backdrop for the inference that the University and its agents would manifest bias toward men, such as Dr Pappas, in disciplinary hearings. In particular, Dr. Pappas cites the following:

(1) The U.S. Department of Education's April 2011 "Dear Colleague" Letter to colleges and universities (Compl. ¶¶ 12–16, 22);

(2) An allegation that JMU was "previously sued" by female sexual harassment victims, which required significant resources to defend against (*id.* ¶¶ 17–18);

(3) An allegation that in 2014, JMU received "harsh criticism" from *The Daily Show* for its handling of three female students' Title IX complaints (*id.* ¶ 20); and

(4) An allegation that JMU has received "significant public criticism of its handling of several sexual harassment cases brought by female students," particularly three media reports—one published as recently as 2018 (*id.* ¶ 19).

Some courts have found that external pressure can "provide[] a backdrop that, when combined with other circumstantial evidence of bias in [a plaintiff's] specific proceeding, gives rise to a plausible claim." *See, e.g.*, *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018). But courts "uniformly hold" that external pressure—such as the Dear Colleague Letter—"alone is not enough to state a claim that the university acted with bias in a particular case." *Doe v. Coastal Carolina Univ.*, 522 F. Supp. 3d 173, 179 (D.S.C. 2021) (quoting *Baum*, 903 F.3d at 586).

Here, though, Dr. Pappas' general allegations of external pressure do not weigh heavily in the analysis. As the complaint notes, the Dear Colleague Letter was rescinded in 2017, approximately two years before Doe's complaint. *Cf. Doe v. Samford Univ.*, 29 F.4th 675, 692

(11th Cir. 2022) ("[Plaintiff's] allegations about a government policy that has been rescinded and replaced do not assist him in crossing 'the line between possibility and plausibility of entitlement to relief.'") (quoting *Twombly*, 550 U.S. at 557).  More to the point, Dr. Pappas' general allegations regarding "harsh criticism" from *The Daily Show* (dating more than five years before Doe brought her complaint) and vague references to previous expensive litigation and media reports (that by Dr. Pappas' own allegation were at least a year old) are far too attenuated to create a meaningful inference that external pressures led JMU and its agents to manifest bias against Dr. Pappas in his case on the basis of sex.  By comparison, in *Baum*, for example, the federal government was actively investigating the university during the disciplinary board's consideration of the plaintiff's case.  903 F.3d at 586.[9]  Dr. Pappas' complaint fails to plausibly allege that, at the time of his case, there was external pressure on JMU to effect institutional bias against men in disciplinary proceedings.

### 2.  Bias of non-JMU defendants

As to the specifics of this case, Dr. Pappas' allegations that two of the hearing panel members were biased against him because of his sex either are conclusory or otherwise fail to raise a plausible inference of sex bias.  Stringham allegedly "endorsed" a podcast with a description that poses the question: "What's up with this male-dominated world?", references "sexism, patriarchy, and misogyny," and asks: "What can we do about it?"  But this allegation is "wholly vague and conclusory."  *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 754 (4th Cir. 2013) (quotations omitted).  The court is left to speculate what action Stringham took that

---

[9] *See also Doe v. University of Ark.-Fayetteville*, 974 F.3d 858, 865–66 (8th Cir. 2020) (finding "substantial pressure on the University to demonstrate that it was responsive to female complainants" where the federal government and the Arkansas legislature had launched investigations against the university and there was an active, highly publicized lawsuit against the university by a female athlete); *Doe v. Purdue Univ.*, 928 F.3d 652, 668 (7th Cir. 2019) (finding that pressure against university to demonstrate compliance with Title IX was "far from abstract" where the U.S. Department of Education's Office of Civil Rights had opened two investigations into the university during the year a complaint was filed against the plaintiff).

constituted an "endorse[ment]," or whether he has even listened to the podcast.  And even if Stringham did express generalized support for this podcast in some way, there is no allegation that he adopted the views expressed in its description.  By all accounts, those statements belong to the podcast, not to Stringham.

Regarding Pass, Dr. Pappas alleges that she "sat on the University's Diversity Council," where she "participated in meetings wherein the Council advocates for greater protection for female students."  But claims that particular adjudicators or investigators have participated in activities whose goal is to assist sexual-assault victims are generally insufficient to state a claim of bias.  *See, e.g.*, *Doe v. Regents of Univ. of Cal.*, 23 F.4th 930, 938 (9th Cir. 2022) ("[M]aking arguably feminist statements, like the ones in [the school's lead investigator's] 2016 tweet, is not alone sufficient to support a reasonable inference that an individual is biased against men."); *Doe v. Loh*, No. PX-16-3314, 2018 WL 1535495, at *10 n.8 (D. Md. Mar. 29, 2018), *aff'd*, 767 F. App'x 489, 491 (4th Cir. 2019) (finding insufficient to support plausible inference of bias assertions that university raised awareness of violence against women, that Title IX Director advocated for female sexual-assault victims, and that she trained students to participate on a review committee using hypotheticals involving female victims).  The complaint provides no other details about Pass or Stringham that would support an inference of sex bias.

In the same vein, Dr. Pappas lodges a variety of allegations regarding aspects of the process that were unfavorable to him—including that Sirocky-Meck should have dismissed Doe's report of sexual misconduct without referring it to the hearing panel[10] and that the hearing panel summarily believed Jane Roe's allegations and evidence while rejecting his—and

---

[10]  As discussed earlier, Doe's Title IX complaint alleges that Dr. Pappas make various comments relating to sex in his personal life.  Regardless of their truth, those were the allegations presented to the University.  As such, the court is hard-pressed to conclude that Sirocky-Meck was required, at the initial stage, to dismiss the complaint as irrelevant to Policy 1340 (which covers sexual harassment).

maintains that JMU found him responsible for sexual misconduct even though the conduct alleged did not amount to harassment (at least in his view). But even if one were to accept Dr. Pappas' conclusory assertions that the process was irregular and the outcome erroneous, nothing in the complaint demonstrates that he was discriminated against *because of his sex*—as opposed to, for example, his status as the accused or as a university professor. Dr. Pappas cites *Doe v. Oberlin College*, 963 F.3d 580 (6th Cir. 2020), for the proposition that procedural irregularities and an "inexplicable" decision on the merits may support an inference of sex bias. *Id.* at 587–88. However, the *Oberlin* court failed to consider that there must be a causal connection between any irregularity or erroneous outcome and the plaintiff's sex. *See id.* at 588–91 (Gilman, J., dissenting). Given its most gratuitous reading, what the complaint essentially alleges is "a one-sided investigation, standing alone"; without more, that raises only "a reasonable inference of anti-*complainant* bias," not of sex discrimination. *Doe v. Univ. of Denver*, 1 F.4th 822, 836 (10th Cir. 2021) (emphasis added).

In sum, the court finds that the complaint fails to create a plausible inference that JMU violated Title IX in Dr. Pappas' disciplinary case and will grant the motion to dismiss Count I.

**E.  Count II: Fourteenth Amendment Procedural Due Process (Against Non-JMU Defendants in Their Individual Capacities)**

The Fourteenth Amendment provides that "no state shall make or enforce any law which shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. To state a procedural due process claim, Pappas must allege facts sufficient to show "(1) a cognizable liberty or property interest; (2) the deprivation of that interest by some form of state action; and (3) that the procedures employed were constitutionally inadequate." *Kendall v. Balcerzak*, 650 F.3d 515, 528 (4th Cir. 2011).

However, because Count II is brought against the non-JMU defendants in their individual capacities, defendants argue they are entitled to qualified immunity, which "protects [government officials] who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011).  The qualified immunity analysis involves two steps.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  A court must consider whether a constitutional violation occurred and, if so, whether the right violated was "clearly established." *Id.* at 201; *Williams v. Ozmint*, 716 F.3d 801, 805 (4th Cir. 2013).  In performing this analysis, however, a court is not required to consider these two steps in any particular order.  *Id.* at 805–06.  A court may exercise its discretion to determine which of the two steps in the qualified immunity analysis "should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 806 (quoting *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).  Here, the court will first consider whether Dr. Pappas' due process rights were violated.  It goes without saying that if a government official did not violate any right, he or she is hardly in need of any immunity, and the analysis ends there. *Henry*, 652 F.3d at 531.

### 1.  Property interest

"Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).  To possess a property interest, a claimant "must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.*

27

"In the context of employment in public education, the independent source for the property interest has been said to be a contract which provides for continued employment, and which can be terminated only for good cause." *Royster v. Bd. of Trs. of Anderson Cnty. Sch. Dist. No. 5*, 774 F.2d 618, 620–21 (4th Cir. 1985) (citations omitted). Thus, "[a] state employee may or may not have a property interest in her employment depending on the terms of that employment." *Rockville Cars, LLC v. City of Rockville*, 891 F.3d 141, 146 (4th Cir. 2018) (citing *Roth*, 408 U.S. at 578).

In Count II, Dr. Pappas alleges that he had a property interest "in his continued employment at the University." (Compl. ¶ 132.) His contract with JMU, which was renewed annually, provides that he may be terminated only "for reasons specified in the policies and procedures of JMU, including but not limited to . . . dismissal for misconduct." (Pappas Contract 2.) The contract further provided that "such termination may occur at any time upon written notice . . . according to the policies and procedures of JMU." (*Id.*) Lastly, the contract gave JMU discretion not to renew Dr. Pappas' employment, provided it gave him sufficient notice. (*Id.* 1–2.) Here, Dr. Pappas claims that his property interest protects him from termination of his employment *during the term of his contract* for reasons other than those specified in JMU's policies, not from the nonrenewal of his contract *after its term has expired* (the situation addressed in *Roth*). As such, the court will assume, for the purpose of its analysis, that Dr. Pappas has adequately stated such a property interest.

As for whether JMU deprived Dr. Pappas of that property interest, "the answer would be evident" had he been officially discharged from his employment. *See Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 173 (4th Cir. 1988). But JMU never fired Dr. Pappas—he resigned. Dr. Pappas claims he was constructively terminated and therefore did not voluntarily relinquish

28

any property interest.  On the other hand, JMU argues that Dr. Pappas has failed to meet the "high standard" of constructive discharge.  (*See* Defs.' Reply Br., Dkt. No. 9, at 16 (quoting *Ofoche v. Apogee Med. Group., Va., P.C.*, 815 F. App'x 690, 692 (4th Cir. 2020)).)

In *Stone*, the Fourth Circuit reasoned that if a public employee plaintiff "resigned of his own free will even though prompted to do so by events set in motion by his employer," he thereby "relinquished his property interest voluntarily and thus cannot establish that the state 'deprived' him of it" within the meaning of the Due Process Clause.  *See* 855 F.2d at 173 (citing *Martinez v. California*, 444 U.S. 277, 281 (1980)).  But "[i]f, on the other hand, [the employee's] 'resignation' was so involuntary that it amounted to a constructive discharge, it must be considered a deprivation by state action" that triggers the protections of the Due Process Clause. *Id.*

To establish a constructive discharge, a plaintiff generally must show "that his 'working conditions became so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'"  *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 211–12 (4th Cir. 2019) (quoting *Green v. Brennan*, 578 U.S. 547, 555 (2016)).  "'Intolerability' is not established by showing merely that a reasonable person, confronted with the same choices as the employee, would have viewed resignation as the wisest or best decision, or even that the employee subjectively felt compelled to resign."  *Id.* at 212.  "Instead, intolerability is assessed by the objective standard of whether a reasonable person in the employee's position would have felt *compelled* to resign, . . . that is, whether he would have had *no choice* but to resign."  *Id.* (internal quotations omitted) (emphasis in original).

Dr. Pappas claims that being "permanently barred from working with student assistants for the remainder of his employment" at JMU effectively "made it impossible for [him] to do his

job" because his high course load, including "hundreds of students," required the active participation of student assistants,[11] and because he needed student assistants to be eligible for grants from the National Science Foundation to fund his research and publishing work.  (Compl. ¶¶ 32, 106–09.)  Regarding Dr. Pappas' courseload and grading of student work, he was not guaranteed any access to student assistance under his employment contract; rather, JMU was only responsible for providing him with "an appropriate office, classroom, and other space."[12] (*See* Pappas Contract 1.)  Nor was he contractually entitled to the teaching workload he maintained at the time he resigned.[13]  And Dr. Pappas does not allege that his workload could not have been adjusted in light of being cut off from the help of student assistants, nor that he was contractually obligated to teach a specific number of classes; his contract required only that he perform his duties "faithfully and to the best of his [] abilities."  (*Id.*)  Regarding his research and publishing, Dr. Pappas never alleges that his job responsibilities at JMU included research or publishing, nor that his employment was at all dependent on whether he could obtain research grants.  And even if he had, the fact that one organization—the National Science Foundation— requires the use of student assistants as a condition for grant funding says little about whether Dr.

---

[11]  Dr. Pappas argues that the court is obligated to accept as true his allegation that the lack of student assistants would deprive his of the ability to fulfill his job requirements such that he was constructively terminated. (Dkt. No. 7 at 26 n.19.)  The court is undoubtedly obligated to assume the truth of the non-conclusory pleadings, such as the fact that JMU prohibited Dr. Pappas from using teaching assistants, that he previously had used teaching assistants to help instruct his classes and grade papers, and that the National Science Foundation required the use of student assistants as a condition for grant funding.  However, the allegation that those facts thus made it "impossible" for Dr. Pappas to proceed with his employment is a "naked assertion[]" that "[is] not entitled to the assumption of truth."  *See Francis*, 588 F.3d at 193 (citing *Iqbal*, 556 U.S. at 664).  The court's inquiry is necessarily focused only on "objective intolerability," *see Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 425 (4th Cir. 2014), not one's subjective perception of the same.

[12]  The contract also provides for "other non-monetary support associated with [Dr. Pappas'] duties as a faculty member at JMU during the term of [the] agreement," but the nature of that support was reserved to "the sole discretion of JMU."  (*See* Pappas Contract 1.)

[13]  *Cf. Gentilello v. Rege*, 627 F.3d 540, 544 (5th Cir. 2010) ("[T]he due process clause does not protect [plaintiff's] specific job duties or responsibilities absent a statute, rule, or express agreement reflecting an understanding that he had a unique property interest in those duties or responsibilities.").

Pappas could have sought funding from another organization before leaving the University entirely.

Broadly, though, the gravamen of Dr. Pappas' argument is that teaching his classes, grading student work, and conducting research without the assistance of other JMU students is, as a condition of employment, so objectively onerous that JMU effectively left him with no choice but to resign. But the Fourth Circuit has made clear that "[d]ifficult or unpleasant working conditions" or dissatisfaction with work assignments, "without more, are not so intolerable as to compel a reasonable person to resign." *Perkins*, 936 F.3d at 212. With respect to the grading of student work and teaching of classes, undoubtedly it would have been more difficult for Dr. Pappas to do his job without student assistants working with him, assuming nothing else in his workload changed. But the allegations in the complaint do not support a plausible inference that this sanction was tantamount to involuntary termination. Therefore, even framing the property interest as Dr. Pappas does and assuming its existence, the complaint fails to state a deprivation of that interest.

### 2. Liberty interest

"The Fourth Circuit has determined that to state a claim for deprivation of a liberty interest in one's reputation or choice of occupation pursuant to 42 U.S.C. § 1983, a plaintiff must allege (1) that the charges made against [him] imposed on [him] a stigma that prevented [him] from engaging in other employment, (2) that the charges were made public by [his] employer, (3) that the charges were made in conjunction with a termination or significant demotion, and (4) that the charges were false." *Wilcox v. Lyons*, No. 7:17-cv-000530, 2018 WL 6422494, at *2 (W.D. Va. Dec. 6, 2018) (citing *Stone*, 855 F.2d at 173 n.5).

31

Here, JMU does not appear to dispute that it imposed a stigma upon Dr. Pappas by finding him responsible for sexual harassment, and Dr. Pappas alleges that he "has already suffered terminations from other employment opportunities" and likely will be unable to continue his employment because of JMU's finding.  (Compl. ¶¶ 142, 158.)  Dr. Pappas also adequately states throughout the complaint that he has never sexually harassed anyone and that Doe's allegations that he did so are not true.  (*See, e.g.*, *id.* ¶¶ 38–45.)

Beyond that, however, his argument for the deprivation of a protected liberty interest is lacking.  First, it is a stretch to suggest, based on the allegations in the complaint, that the harassment charges were "made public" by JMU.  To invoke due process protections of a liberty interest, a charge of a serious character defect must be publicly disclosed.  *See Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 312 (4th Cir. 2006).  Dr. Pappas certainly submits that he will be "forever harm[ed] when he applies to jobs that require background checks or character and fitness evaluations" (Compl. ¶ 135) and that he lost other job opportunities "after *he disclosed* the University's erroneous findings to those employers (*id.* ¶ 142 (emphasis added)).  But neither of those allegations show that *JMU* made these charges public.  Dr. Pappas insists that the charges were "at least *de facto* made public" by JMU (Dkt. No. 7 at 34) because information about the allegations was posted on "the University's Reddit message board website," and Jane Doe published an op-ed in the school's student newspaper that discussed the same.  (Compl. ¶¶ 45, 114.)  The court disagrees.  There is no allegation, nor would it be fair to surmise, that JMU controls the content published either on the Reddit board or by the student newspaper.[14]  Lastly, making a notation on Dr. Pappas' "employment record" (Compl. ¶ 112) at

---

[14]  And even if the newspaper is indeed sponsored by JMU or otherwise is subject to its oversight, prohibiting Doe from publishing an op-ed about her alleged experience with sexual harassment by a professor could have created additional constitutional issues.  *See Hazelwood v. Kuhlmeier*, 484 U.S. 260, 273 (1988) (holding that a

JMU that he was found responsible for sexual harassment is not the same as publicly disclosing the finding.

Even assuming any of those allegations amounted to public disclosure of the disciplinary findings by JMU, Dr. Pappas' claim to a liberty interest fails on a similar ground as was fatal to the property interest: the disciplinary findings were not made in conjunction with a "discharge or significant demotion." *See Stone*, 855 F.2d at 173 n.5. First, for the reasons noted earlier, Dr. Pappas' resignation after being banned from working with student assistants was not a constructive discharge. Further, the disciplinary sanction imposed did not constitute a "significant demotion," which the Fourth Circuit has defined as "the reassignment of an employee to a position outside his field of choice" or "an offer of a job far beneath the one he had, where being so demoted is to be as effectively excluded from one's trade or calling as by being thrown out on the street." *See Ridpath*, 447 F.3d at 309, 314 (internal quotations omitted). In *Ridpath*, for example, the Fourth Circuit held that a university employee whose chosen career was intercollegiate athletics administration suffered a "significant demotion" when he was "ousted" from the university's Athletics Department and reassigned from Compliance Director to Director of Judicial Programs. *Id.* at 311–12. Dr. Pappas, on the other hand, was not reassigned to another department or "ousted" from his position at all—he remained a JMU professor at the same salary in the same department. For the same reasons as with the property interest, the complaint fails to show that prohibiting Dr. Pappas from using student assistants was "effectively excluded" him from his trade as a professor. *See id.* at 314.

---

school may only "exercis[e] editorial control over the style and content" of a school-sponsored newspaper if its actions are "reasonably related to legitimate pedagogical concerns").

Accordingly, the complaint does not plausibly allege that Dr. Pappas was deprived of any liberty interest in his reputation and status as a professor, and Count II must be dismissed for failure to state a claim.[15]

## F.  Count III: Fourteenth Amendment Procedural Due Process (Against Sirocky-Meck in Her Official Capacity)

In addition to the individual-capacity claims against all non-JMU defendants, Dr. Pappas also brings a Fourteenth Amendment claim against Sirocky-Meck in her official capacity as JMU's Title IX Coordinator with respect to the deprivation of both a property and liberty interest.  He seeks (1) a permanent injunction prohibiting Sirocky-Meck or any agent of JMU from making any notation on his professional record relating to discipline or investigation of Doe's complaint or taking any further action to deprive him of his due process rights; and (2) a declaration that the investigation and adjudication at issue violated his constitutional rights and that the Due Process Clause requires a live hearing with some form of live cross-examination in the context of disciplinary proceedings.

### 1.  Waiver of sovereign immunity

Sirocky-Meck argues that this claim is barred by sovereign immunity under the Eleventh Amendment.[16]  An officer of a state acting in his or her official capacity is entitled to sovereign

---

[15]  Even if Dr. Pappas could have plausibly alleged the deprivation of either a property or liberty interest, the court finds that the non-JMU defendants would still be entitled to qualified immunity on Count II because there is no Supreme Court, Fourth Circuit, or Supreme Court of Virginia decision rendering it "clearly established" that prohibiting a public employee (such as a professor) from using an accessory resource to which the employee is not contractually entitled (such as student assistants) in order to complete the work constitutes a deprivation of either liberty or property under the Due Process Clause, *see Ray v. Roane*, 948 F.3d 222, 229 (4th Cir. 2020), nor is the same clearly established as a matter of "general constitutional principles or a consensus of persuasive authority," *id.*

[16]  Regardless of whether aspects of the merits of Count III have been addressed elsewhere in the case, this court cannot assume it has subject matter jurisdiction over this count.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).  And the Supreme Court has specifically instructed that a district court must first determine whether it has jurisdiction before it can decide whether the plaintiff has stated a claim for relief.  *See Bell v. Hood*, 327 U.S. 678, 682 (1946).  In the Fourth Circuit, sovereign immunity is a question of subject matter jurisdiction. *See Cunningham*, 888 F.3d at 649.

immunity from claims for *money damages*. *See id.* at 70.  However, under the *Ex parte Young* exception, a defendant may be sued in his or her official capacity for "prospective, injunctive relief . . . to prevent ongoing violations of federal law." *McBurney v. Cuccinelli*, 616 F.3d 393, 399 (4th Cir. 2010) (citing *Ex parte Young*, 209 U.S. 123, 159–60 (1908)).  "The requirement that the violation of federal law be ongoing is satisfied when a state officer's enforcement of an allegedly unconstitutional state [policy] is threatened, even if the threat is not yet imminent." *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 330 (4th Cir. 2001) (citation omitted)

Dr. Pappas first responds that Sirocky-Meck waived Eleventh Amendment immunity by removing this case to federal court.  He relies principally on the Supreme Court's decision in *Lapides v. Board of Regents of the University System of Georgia*, 535 U.S. 613, 623 (2002), for the proposition that a state official who "voluntarily invoke[s] the jurisdiction of the federal court[s]" via removal thereby waives sovereign immunity.  *See id.* at 622.

However, at least in the Fourth Circuit, the *Lapides* rule is not so broad.  In *Lapides*, the plaintiff—a professor employed by the Georgia state university system—brought suit in state court, alleging that university officials (in their official capacities) had placed allegations of sexual harassment in his personnel files in violation of both Georgia and federal law.  *Id.* at 616. The state conceded that it had waived its sovereign immunity by consenting to *state-law suits* in its own courts but argued that it was regained immunity under the Eleventh Amendment upon removal.  *Id.* at 616–17.  The only issue, then, was whether the state could indeed regain immunity it already waived by removing to federal court.  *Id.* at 616, 622.  The district court— and, eventually, the Supreme Court—held that it could not.  *Id.* at 616.  In doing so, the Supreme Court crucially limited its holding to the state-law claims because the only federal claims Lapides brought against the state—pursuant to § 1983—were for money damages, and a state is

not a "person" against whom a § 1983 claim for money damages may be asserted.  *Id.* at 617.

Moreover, the Court explicitly declined to address "the scope of waiver by removal in a situation

where the State's underlying sovereign immunity from suit has not been waived or abrogated in

state court," which is the situation presented here by Dr. Pappas' federal claims against Sirocky-

Meck.  *See id.* at 617–18.

The Fourth Circuit has since interpreted *Lapides* to hold only that, upon removal to

federal court, a state does not regain sovereign immunity if it already consented to suit in the

state court.  *See Stewart v. North Carolina*, 393 F.3d 484, 489–90 (4th Cir. 2005).  And more

recently, as other courts of appeals split on whether to adopt the holding of *Stewart*, the Fourth

Circuit has reaffirmed it.  *See, e.g.*, *Passaro v. Virginia*, 935 F.3d 243, 247 (4th Cir. 2019)

("Nothing in these out-of-circuit cases makes us inclined to revisit *Stewart*.").  As such, Dr.

Pappas is incorrect that Sirocky-Meck (or any defendant, for that matter) waived sovereign

immunity by removing to this court, and the court will proceed to considering whether the *Ex

parte Young* exception applies.

### 2.  *Ex parte Young* exception

Although *Ex parte Young* provides an avenue for plaintiffs seeking injunctive and

declaratory relief against state officials to enjoin their enforcement of an unconstitutional policy,

"[t]he purpose" of allowing such relief "is not aided by enjoining the actions of a state official

not directly involved in enforcing the subject [policy]."  *Waste Mgmt. Holdings*, 252 F.3d at 331.

Accordingly, the Fourth Circuit has read *Ex parte Young* to require a "'special relation' between

the officer being sued and the challenged [policy]" before one may invoke the exception.

*McBurney*, 616 F.3d at 399 (quoting *Ex parte Young*, 209 U.S. at 157).  "General authority to

enforce the [policies] of the state is not sufficient to make government officials the proper parties

to litigation challenging the [policy]." *Waste Mgmt. Holdings*, 252 F.3d at 331. Rather, "the 'special relation' requirement is satisfied when the complaint plainly alleges that the defendant[] ha[s] the ability to order the relief requested. *See Doe v. Citadel*, No. 2:21-cv-04198-DCN, 2022 WL 2806473, at *5 (D.S.C. July 18, 2022) (citing *S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 333 (4th Cir. 2008) (nothing that the "special relation" requirement is meant to "ensure[] that a federal injunction will be effective with respect to the underlying claim")).

Here, Dr. Pappas has properly alleged such a special relation as to the constitutionality of JMU's Title IX adjudicatory process, but not as to his employment record. Sirocky-Meck argues that Dr. Pappas has failed to explain how "[she], a Title IX Coordinator, would have any authority to make any notation on his professional record relating to discipline or investigation of Doe's complaint [or] issue a declaration that the investigation and adjudication at issue here violated [his] due process [rights] and that the Due Process Clause requires a live hearing with live cross-examination." (Defs.' Reply Br. 11.)

As to the injunctive relief, she is partially correct; Dr. Pappas does not allege that Sirocky-Meck or her office has any control over what notations are made or maintained on his "professional record," let alone over the actions of other "agent[s] of the University." But he *has* plausibly alleged that Sirocky-Meck has control over JMU's Title IX disciplinary processes; as JMU's policy confirms, the Title IX Coordinator "has oversight over" the University's Title IX policy, "coordinates the actions of the various Title IX officers on campus," and "is responsible for tracking [JMU's] compliance with Title IX." (*See* Policy 1340 at 6.) As such, she bears a "special relation" to JMU's Title IX disciplinary policies and, based on the allegations, has the authority to ensure that its execution does not violate Dr. Pappas' due process rights in the future. Moreover, as to the requested declaration, Sirocky-Meck misunderstands the relief Dr. Pappas

seeks here.  He is asking *this court*, not *her*, to issue a declaration that the processes used in his disciplinary case violated his constitutional rights and that the Due Process Clause requires a live hearing with cross-examination—a form of relief which the court is fully empowered to provide, should it later be warranted.

Accordingly, the court finds that the *Ex parte Young* exception permits Dr. Pappas to bring this claim against Sirocky-Meck, except to the extent it seeks a change in his "professional record."  As such, the motion to dismiss for lack of subject matter jurisdiction based on sovereign immunity is denied with respect to Count III.

### 3.  Deprivation of liberty or property interest

For the reasons provided earlier on Count II, Dr. Pappas failed to plausibly allege that he was deprived of either a recognized property or liberty interest.  (*See supra* pp. 26–34.)  As such, Count III must likewise be dismissed for failure to state a claim.

### G.  Count IV: First Amendment (Against Non-JMU Defendants in Their Individual Capacities)

In Count IV, Dr. Pappas claims that his alleged comments about sex in the abstract and sexual norms, even if made, were constitutionally protected speech made as a private citizen, and that the non-JMU defendants investigated, charged, and disciplined him for allegedly exercising his rights under the Free Speech Clause of the First Amendment.  As with Count II, defendants assert they are entitled to qualified immunity.  The court will once again consider first whether the complaint alleges a constitutional violation before evaluating whether the right violated was clearly established, if necessary.

It is well settled that "public employees do not surrender all their First Amendment rights by reason of their employment."  *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006).  But that does not mean that the speech rights of, for example, professors employed at public schools, are "so

boundless that they may deliver any message to anyone anytime they wish."  *See Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2423 (2022).  "In addition to being private citizens, teachers . . . are also government employees paid in part to speak on the government's behalf and convey its intended messages."  *Id.*

To state a retaliation claim under the Free Speech Clause as a public employee, the plaintiff must demonstrate (1) that he spoke "as a citizen upon a matter of public concern [rather than] as an employee about a matter of personal interest;" (2) that his "interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public;" and (3) that his "speech was a substantial factor" in the employer's decision to impose discipline.  *McVey v. Stacy*, 157 F.3d 271, 277–78 (4th Cir. 1998).  With respect to the content of the speech, as noted earlier, the court must assume that Doe's recollection of what Dr. Pappas said is true because the complaint itself assumes, for the sake of argument, that her recollection is true.[17]

An employee's speech involves a matter of public concern if the speech addresses an issue of "social, political, or other interest to a community."  *Ridpath*, 447 F.3d at 316 (quoting *Urofsky v. Gilmore*, 216 F.3d 401, 406–07 (4th Cir. 2000)).  Generally, expressions about matters of one's own interest are not protected by the First Amendment as matters of public concern.  *Stroman v. Colleton Cnty. Sch. Dist.*, 981 F.2d 152, 156 (4th Cir. 1992) (citing *Connick v. Myers*, 461 U.S. 138, 142 (1983)).

Here, even assuming his speech was protected to begin with, the matters on which Dr. Pappas spoke during the coffee shop conversation with Jane Doe were plainly not of public

---

[17]  Dr. Pappas cites *Doe v. Princeton University*, 30 F.4th 335 (3d Cir. 2022) for the proposition that the court must credit the allegations of the complaint over that of the integral document which the complaint partially incorporates by reference.  The holding of *Princeton* is not the law in the Fourth Circuit—which, in *Goines* and other earlier decisions, seems to have adopted quite a different rule.

concern.  According to Doe's Title IX complaint (to which Dr. Pappas refers directly in his complaint in this case), he largely spoke about his personal dating life with younger girlfriends and the benefits of dating older men.  He allegedly shared that several of his former romantic partners were people he initially met as students in his class and that he has never dated anyone over the age of 30.  The court expresses no view on whether these alleged comments constituted sexual harassment as defined by JMU's policies, but, regardless, they fall far outside the realm of public life, and JMU was permitted to impose discipline upon a professor for making such comments to a student.  And even if those comments could somehow be construed as matters of public concern, a university's interest in disciplining an employee accused of sexually harassing a student far outweighs any interest of the employee in making sexually suggestive comments to students, "in the abstract" or not.

As such, Dr. Pappas has not plausibly alleged a violation of his free speech rights and Count IV will be dismissed.

## H.  Count V: First Amendment (Against Sirocky-Meck in Her Official Capacity)

As was true for the due process claims, Dr. Pappas also brings an official-capacity claim against Sirocky-Meck for violation of his First Amendment rights.  Once again, Sirocky-Meck argues that she is entitled to sovereign immunity.  The parties presented substantially the same arguments on sovereign immunity for Count V as they did for Count III.  Finding no meaningful legal distinction between the two counts on this issue, the court finds that Sirocky-Meck is not entitled to sovereign immunity on Count V for the reasons noted in Count III.  (*See supra* pp. 34–38.)  Accordingly, to the extent Sirocky-Meck moves to dismiss Count V for lack of subject matter jurisdiction based on sovereign immunity, the motion is denied.

Likewise, as the court concluded on Count IV, Dr. Pappas failed to plausibly allege a violation of his First Amendment free speech rights.  (*See supra* pp. 38–40.)  Thus, Count V must be dismissed for failure to state a claim.

## I.   Counts VI and VII: Supplemental Jurisdiction Over State-Law Claims

Lastly, Dr. Pappas brings two state-law claims: breach-of-contract claim against JMU and a tortious interference claim against Sirocky-Meck in her individual capacity.

Because the court is dismissing the only federal claims in the case, the court has discretion to decline supplemental jurisdiction over the state-law claims and to dismiss them without prejudice pursuant to 28 U.S.C. § 1367(c)(2).  In exercising its discretion, the court must consider factors of judicial economy, convenience, fairness, and comity.  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).  Generally, though, when a case is in its early stages, courts will decline to exercise jurisdiction.  13D Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure*, (3d ed., April 2022 update) ("[I]f the jurisdiction-invoking federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.") (internal quotations omitted).  The court sees no unfairness or inconvenience to any party from a dismissal without prejudice.  The court finds that the comity factor also favors declining jurisdiction because the remaining claims are state-law contract and tort claims involving Virginia residents that occurred in Virginia.  Thus, the state courts have a significant interest in resolving these types of claims.

Considering these factors, the court will decline to exercise jurisdiction over Counts VI and VII and dismiss these claims without prejudice.

## IV.  CONCLUSION

For the reasons stated herein, the motion to dismiss for lack of subject matter jurisdiction as to Counts III and V based on sovereign immunity will be denied, the motion to dismiss for failure to state a claim will be granted as to Counts I through V, and the court will decline to exercise supplemental jurisdiction over Counts VI and VII.  An appropriate order will follow.

Entered: March 31, 2023.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge